#23759-a-JKK

**2008 SD 6**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

  v.

TORY TIEGEN,                    Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JANINE M. KERN
Judge

\* \* \* \*

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                    and appellee.

KEVIN S. LEWIS                    Attorney for defendant
Rapid City, South Dakota                    and appellant.

\* \* \* \*

ARGUED ON OCTOBER 3, 2007

OPINION FILED **01/16/08**

#23759

KONENKAMP, Justice

[¶1.]     Defendant was convicted of kidnapping Troy Klug. Klug is believed to be dead, but his body has never been found. On appeal, defendant asserts trial court error in: (1) denial of his right to a speedy trial; (2) admission in evidence of multiple out-of-court statements by a co-conspirator; (3) admission of his incriminating jail-house messages written to a co-defendant, who defendant alleges acted as an agent for law enforcement investigators; and (4) his sentence of 100 years imprisonment after the court made statements suggesting that defendant probably killed Klug. We affirm on all issues.

## Background

[¶2.]     On July 12, 2004, Troy Klug and his girlfriend's brother, Robert, went to Cynthia Kindall's home to obtain drugs. Klug called his girlfriend, Duanna Beebe, multiple times, but she would not answer because she was upset at him for buying drugs. Later that day, Klug sent Beebe a text message asking if her brother, Robert, was with her. She responded that he was not. That was the last communication she had with Klug. As the day went on, Klug never came home, and she began to worry. She called his cellular phone multiple times and left messages. After 7:00 p.m., however, Klug's voice mailbox was full and she could no longer leave a message.

[¶3.]     Beebe later recounted in court that at 9:30 p.m. Cynthia Kindall and Tory Tiegen (defendant) showed up at her and Klug's house. They came upstairs to her bedroom. She asked if they knew where Klug was. Kindall replied that Klug had shown up at her house, but she told him to leave. At some point, defendant and

-1-

Kindall, while in Beebe's bedroom, rummaged through Klug's possessions. Defendant took a bottle of Klug's cologne and said, "Well, if it's Troy's, it's ours now." Both Kindall and defendant made similar remarks about Klug's things. Beebe pressed the two about Klug's whereabouts. Kindall said that Klug was no longer a problem, and remarked, "Isn't that right, Tory" to which defendant responded, "Yes." According to Beebe, they were smirking when they said this.

[¶4.] The next day, July 13, Beebe had a friend staying with her. Just after midnight, Kindall and defendant showed up at her home again. They entered through her living room window and came running up the stairs. Kindall went into Beebe's bedroom and kept asking Beebe what was wrong with her. Beebe was in bed recuperating from an operation. Her incision had become infected. Beebe's friend asked them what happened to Klug. Kindall responded that she did not know where he was. Then, she said to Beebe, "Honey, I need you to come with me. I got to go away for a while and I need you to go with me." Beebe refused to go. During this exchange defendant was pacing back and forth and finally said that they did not have time and needed to go. Beebe told them she had filed a missing persons report on Klug and that she was probably on twenty-four-hour surveillance. At that point, they left.

[¶5.] At 3:00 a.m. on July 14, 2004, Kindall and defendant showed up in Kindall's vehicle at Tell Cook's home in Belle Fourche, South Dakota. According to Cook, Kindall and defendant were ranting about people owing money and about snitches. Klug allegedly owed Kindall $300 from previous drug deals. Defendant had Cook come to the trunk of Kindall's vehicle. Defendant opened the trunk,

revealing a man inside. His hands, feet, and head were bound with duct tape. He was face down, with his feet in the air, stripped naked except for boxer shorts. Defendant punched him in the back and yelled, "wake up mother fucker." The man made muffled noises. Cook believed he was still alive. When Cook asked what defendant was going to do, defendant said they would either "go to Denver and turn him in or go to North Dakota and dig a hole."

[¶6.] The next day, July 15, defendant and Kindall showed up again at Cook's house. Cook asked defendant what he had done with the man in the trunk. Defendant replied that he put him in a toolbox and left him there all day. Cook asked if he gave him water because it was hot. Defendant replied, "No, and it's too late for all that anyway." Cook recalled that defendant said he had gone to the toolbox a few times throughout the day and was beating the man. Defendant said to Cook that he felt bones crush in his face and he thought "that's what did him in."

[¶7.] At 4:00 a.m. on July 17, Kindall and defendant arrived in North Dakota at Ross Thomas's home. Jamie Keefe saw both of them there. At 9:30 p.m., according to Keefe, defendant was cutting fringes on a blanket and Kindall was doing laundry. Defendant asked Kindall if she was washing the laundry in cold water, to which she responded, "Yes, I washed it in cold water."

[¶8.] On July 18, Kindall and defendant were still at Thomas's residence. Keefe helped them clean out Kindall's car. According to Keefe, the inside of the car was stripped down to the metal frame. Bleach had been poured in it. Maggots were floating in a solid layer on the bleach. Defendant told her he poured about three gallons of bleach in the car and that the maggots were from a milk spill. Keefe

helped defendant clean by scrubbing and using a shop vacuum to suck up the bleach. The rags they used to clean the car were eventually taken to a fire stoke and burned. According to Keefe, at some point, Kindall yelled at defendant that the car should have been cleaned five days ago. Keefe recalled that defendant attempted to clean the car's upholstery with Febreze and Woolite. He also had Keefe scrub the floorboards, which had a rust-colored stain.

[¶9.] Brent Gromer, a special agent for the South Dakota Division of Criminal Investigation, was assigned to look into Klug's disappearance. At that time, defendant had been identified as a suspect based on Agent Gromer's interview with Beebe. On July 20, 2004, Agent Gromer and two other officers interviewed Tell Cook. Cook told them of seeing defendant and Kindall at his house, but repeatedly denied seeing anyone in a car trunk. He did admit, however, that defendant mentioned "going back to Rapid City and snatchin some guy and . . . well you never know I might have already done it. . . . Could be in the trunk outside. . . ." Cook also recalled that the name "Troy" was mentioned. The officers were not satisfied that Cook was revealing everything he knew. Agent Gromer made several strong comments to motivate Cook to be more cooperative. On July 22, Cook was again interviewed, but this time by two different law enforcement officers. He told them that Klug was over at Kindall's house and defendant was using Klug to move things in the basement and they hit him and duct taped him. Cook was arrested on August 6, 2004, and placed in the Pennington County jail.

[¶10.] Agent Gromer and Special Agent John Griswold interviewed defendant in North Dakota on July 22, 2004. The next day, defendant was charged with

kidnapping Klug. On August 4, he was indicted on one count of kidnapping and one count of conspiracy to commit kidnapping.[1] Defendant was placed in the Pennington County jail, in a cell adjacent to Cook's. While they were there, Cook had contact with defendant through a "kiting system" whereby an inmate would have letters or notes sent from one cell to another. Cook had written defendant and defendant wrote back. Defendant used the nickname "Chopper" when referring to Cook. Cook gave defendant the nickname "Mad Hatter." Cook told his lawyer about the notes he obtained and that they contained incriminating information about defendant. Cook and his lawyer met with law enforcement officers on September 30, 2004. He decided to tell everything he knew, and a plea agreement was reached.[2] Cook told the officers of seeing Klug in the trunk, recounted the statements defendant and Kindall made, and turned over some of the notes defendant had written.

[¶11.]     After Cook made a plea agreement, Kindall and defendant remained to be tried together. Defendant moved to sever his trial from Kindall's. The court granted the motion. Defendant also challenged the State's intention to introduce Kindall's out-of-court statements. She was not available to testify because she was found incompetent to stand trial. The State sought to introduce multiple statements made by Kindall to Beebe, Keefe, and Cook. It contended that the statements were not hearsay because they were made in furtherance of the

---

1.     The State dismissed the conspiracy charge on May 12, 2005.

2.     Cook pleaded guilty to misprision of a felony for his failure to contact law enforcement authorities when he observed a felony taking place.

conspiracy to kidnap Klug. The court examined each statement the State sought to introduce and addressed whether each met the requirements of SDCL 19-16-3(5). It ruled that some statements were admissible and some were not. The court then took under advisement whether the statements would, nevertheless, be inadmissible because Kindall was unavailable.

[¶12.]      Defendant next challenged the State's plan to introduce the jailhouse "kites" defendant sent to Cook. According to defendant, Cook obtained these notes in violation of his Sixth Amendment right to counsel because at the time Cook obtained information from defendant, he was represented by counsel. Cook, defendant argued, was acting as an agent of law enforcement and elicited the information at the direction of law enforcement officers. After a hearing, where Cook, the officers, and others testified, and certain transcripts of law enforcement interviews were admitted, the court found the "kites" admissible. It held that Cook was not acting as an agent for law enforcement: he wrote to defendant of his own volition and the investigating officers were not aware of Cook's actions until after the fact.

[¶13.]      Defendant's trial began on June 20, 2005, 308 days after he was arraigned, and thirty-three days short of a year from when he was arrested. Kindall did not testify at his trial. But many of her statements, previously determined by the court to be admissible, were admitted over defendant's objection. The "kites" were also admitted. Defendant was found guilty of kidnapping Klug and sentenced to 100 years in the penitentiary. He appeals asserting the following six issues: (1) his right to a speedy trial under the Sixth Amendment to the United

States Constitution and Article VI, section 7 to the South Dakota Constitution was violated; (2) his Sixth Amendment right to counsel was violated when law enforcement used Cook to elicit information from defendant while defendant was represented by counsel and incarcerated; (3) the court erred when it admitted co-conspirator statements of Kindall under SDCL 19-16-3(5); (4) the court erred in finding that a conspiracy existed because Kindall was found incompetent to stand trial and one cannot have a conspiracy with someone that is incompetent; (5) he was denied his right to cross examine Kindall in violation of his right to confront witnesses; and (6) the court erred when it imposed a grossly disproportionate sentence by considering facts not part of the kidnapping charge.

### Standard of Review

[¶14.]       We apply a de novo standard of review to claims of constitutional violations.  State v. Dillon, 2001 SD 97, ¶12, 632 NW2d 37, 43 (citing State v. Stanga, 2000 SD 129, ¶8, 617 NW2d 486, 488).  Decisions on motions to suppress for violations of legal rights are also reviewed de novo.  State v. Stevens, 2007 SD 54, ¶5, 734 NW2d 344, 346 (quoting State v. Hess, 2004 SD 60, ¶9, 680 NW2d 314, 319 (quoting State v. Herrmann, 2002 SD 119, ¶9, 652 NW2d 725, 728 (citations omitted))).  Findings of fact, however, are reviewed under the clearly erroneous standard.  *Id.* (citing State v. Tofani, 2006 SD 63, ¶24, 719 NW2d 391, 398).  A claim that a sentence is grossly disproportionate is reviewed by the standards set out in *State v. Bonner*, 1998 SD 30, ¶17, 577 NW2d 575, 580.

**Analysis and Decision**

**1. Speedy Trial**

[¶15.]    Defendant contends that he was denied his right to a speedy trial under the United States and South Dakota constitutions.  He is not arguing that our 180-day rule was violated.[3]  *See* SDCL 23A-44-5.1.  Rather, he asserts that the delay in bringing him to trial occurred because the State was "slow on discovery," on scientific testing, and on its overall investigation of the case.  According to defendant, he was prejudiced because he was deprived of his freedom while incarcerated the entire time, and the State, by its delay, had more time to organize its case against him.

[¶16.]    In examining whether a defendant's constitutional right to a speedy trial was violated, we consider:  "(1) the length of the delay; (2) the reason for the delay; (3) whether the accused asserted the right; and (4) whether the accused was prejudiced by the delay."  State v. Jones, 521 NW2d 662, 668 (SD 1994) (citing Barker v. Wingo, 407 US 514, 530, 92 SCt 2182, 2193, 33 LEd2d 101 (1972)).  Delays of over a year are presumptively prejudicial; delays of less than a year are not.  *See* State v. Karlen, 1999 SD 12, ¶¶20-21, 589 NW2d 594, 599; State v. Goodroad, 521 NW2d 433, 437 (SD 1994); State v. Stock, 361 NW2d 280, 284 (SD

---

3.    If this were an appeal on the 180-day rule, no violation presents itself.  Trial counsel conceded during a motions hearing that the period from September 27 through December 31, 2004, "would be held against the defense" in computing the 180-day rule.  Indeed, the trial court found that in the time frame from September 27, 2004, through May 16, 2005, 261 days were properly excludable under the 180-day rule.  Appellate counsel was not trial counsel.

1985); State v. Holiday, 335 NW2d 332, 334-35 (SD 1983); State v. Krana, 272 NW2d 75, 77-78 (SD 1978); State v. Black Feather, 249 NW2d 261, 264 (SD 1976); State v. Pickering, 87 SD 331, 338, 207 NW2d 511, 515 (1973).

[¶17.]    Defendant was arrested on July 23, 2004. His trial began on June 20, 2005. The delay falls thirty-three days short of a year, and therefore, it is not presumptively prejudicial. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Holiday*, 335 NW2d at 334-35 (quoting *Barker*, 407 US at 530, 92 SCt at 2192, 33 LEd2d 101); *see also Karlen*, 1999 SD 12, ¶¶20-21, 589 NW2d at 599.

[¶18.]    Although defendant alleges that he was prejudiced because the State had more time to build its case against him, he has not shown how his *defense* was prejudiced by the delay. That is the more important question. Indeed, he makes no claim that because of the delay a defense witness became unavailable or evidence was lost or degraded. *See Jones*, 521 NW2d at 669-70; *Goodroad*, 521 NW2d at 437; People v. Holtzer, 660 NW2d 405, 414 (MichCtApp 2003) ("enhancement of the prosecution's case" is not equal to "impairment of the defense"). His argument that he was prejudiced because he was incarcerated the entire time is unpersuasive. The right to a speedy trial is designed to protect a defendant from oppressive pretrial incarceration, but here his right to a speedy trial was not violated. *See Jones,* 521 NW2d at 669. Moreover, it would be unusual to find a constitutional violation when the 180-day rule has not been violated. *See* United States v. Titlbach, 339 F3d 692, 699 (8thCir 2003).

### 2. Incriminating Notes

[¶19.]     Defendant argues that his right to counsel was violated when Cook obtained incriminating notes from him while they were in jail. According to defendant, Cook was acting as an agent for the State when he solicited defendant's written responses at law enforcement direction. From defendant's perspective, this arrangement began during the interview with Cook on July 20, 2004. Cook denied having seen Klug in the car trunk, and Agent Gromer strongly encouraged Cook to be more cooperative. For his part, Cook was concerned that he may be implicated in a crime and asked Gromer if he could "make it go away." Agent Gromer said he could make no promises, but he could talk to the prosecutor and the judge. Gromer told Cook to "pound the pavement" and "do every God damn thing" he could to find defendant and Kindall.

[¶20.]     When asked at the motion hearing whether Agent Gromer was enlisting Cook to be an informant, Gromer replied, "Yes, or help us. Not necessarily be an informant, but to help us gather intelligence as to where [defendant and Kindall] were at and possibly gather other information." At that time, both defendant and Kindall were still suspects and had not been apprehended. Neither of them was then represented by counsel. Agent Gromer testified that his remarks — "pounding the pavement" and "doing every God damn thing" — were directed at motivating Cook to help locate defendant and Kindall.

[¶21.]     Following this interview, Agent Gromer and Cook did not speak again until September 30, *after* Cook obtained the notes from defendant. It was in this meeting that Agent Gromer first learned that the notes even existed. At this

meeting, which was videotaped, Agent Gromer and Cook made statements defendant now relies on to further his argument. Cook told Agent Gromer that he had been trying for seven weeks to finally get these letters from defendant. Apparently, there was a joking reference to the happenstance of defendant's and Cook's adjacent cells: Gromer made a comment about using "every trick in the book." And Cook remarked that he was "playing cop."

[¶22.] Several people testified at the suppression hearing, including Cook, Agent Gromer, Shawn Wood (a security lieutenant at the jail), and Cook's attorney, Randy Connelly. The court also reviewed the transcripts from law enforcement interviews of Cook. Agent Gromer testified that he did not direct anyone at the jail to place defendant and Cook in adjacent cells. Nor did he tell Cook to elicit information from defendant while they were in jail. Cook testified that no one asked him to solicit incriminating responses from defendant and that he never considered himself to be an informant. He said that after his arraignment, which was held along with Kindall's and defendant's on August 16, he felt the impact the crime had when he saw one of Klug's family members crying in court, and he then suggested his cooperation to his attorney.

[¶23.] The circuit court's decision to deny defendant's motion to suppress was largely based upon credibility determinations. The court concluded that Cook made a personal decision to elicit the information, evidenced by the fact that he chose to keep some of the notes and throw others away. It also found that Agent Gromer did not recruit Cook to be an agent for law enforcement. No agreement existed, according to the court. It found that, despite Agent Gromer's "quip," law

enforcement officers did not direct that defendant and Cook be housed adjacent to each other. Accordingly, the court ruled that defendant's constitutional rights were not violated and denied his motion to suppress.

[¶24.] While failing to establish an explicit law enforcement agreement with Cook, defendant contends nonetheless that an agreement was implicit in the conduct between Cook and law enforcement officers. Defendant argues that because it is rare that a defendant will have direct proof of efforts to elicit information from an accused with counsel, the evidence need only establish that law enforcement officers must have known they were "circumventing the accused's right to have counsel present[.]" *See* Maine v. Moulton, 474 US 159, 176, 106 SCt 477, 487, 88 LEd2d 481 (1985). Thus, defendant claims that based on the statements made to Cook, the State "must have known" that Cook would obtain information from defendant while he was incarcerated. *See id.*

[¶25.] There was nothing in Agent Gromer's statements to Cook at the July 20th meeting that proves that the State knew or should have known that Cook would try to obtain information from defendant, *while* defendant was incarcerated and represented by an attorney. Agent Gromer's comments were made when defendant was still at large and only a suspect. The circuit court found that there was no explicit or implicit agreement to have Cook prod defendant for admissions. A court's findings of fact from a suppression hearing are reviewed under the clearly erroneous standard of review. State v. Lockstedt, 2005 SD 47, ¶14, 695 NW2d 718, 722 (citing State v. Guthrie, 2001 SD 61, ¶56, 627 NW2d 401, 423 (citation omitted); SDCL 23A-32-9). "As long as the police do nothing to direct or control or involve

themselves in the questioning of a person in custody by a private citizen, such questioning does not violate the fifth or sixth amendments." United States v. Surridge, 687 F2d 250, 255 (8thCir 1982). Because we give deference to the trial court's findings of fact and particularly to credibility determinations, we conclude that the decision was not erroneous.

### 3. Admission of Co-Conspirator Statements

[¶26.] Defendant argues that the court erred when it admitted Kindall's out-of-court statements under SDCL 19-16-3(5). That rule provides, in part,

> A statement is not hearsay if it is offered against a party and is:
> . . .
>
> (5) A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

*Id.* According to defendant, the statements should not have been admitted because they were not made in furtherance of the conspiracy.

[¶27.] Before a co-conspirator's out-of-court statement may be admitted in evidence, (1) "there must be substantial evidence of conspiracy;" (2) "the statement must have been made while the conspiracy was continuing; and" (3) "the statement must have constituted a step in furtherance of the conspiracy." State v. Stavig, 416 NW2d 39, 41 (SD 1987) (citing State v. Smith, 353 NW2d 338 (SD 1984)) (additional citation omitted). "To satisfy the test of admissibility, there need only be a showing that there is some reasonable basis for concluding that the statement was made in furtherance of [the] conspiracy." *Id.* (citing *Smith*, 353 NW2d at 343). A court's decision to admit the statements under SDCL 19-16-3(5) is reviewed under the

clearly erroneous standard. *See* United States v. Beckman, 222 F3d 512, 523 (8thCir 2000) (citing United States v. Oseby, 148 F3d 1016, 1023 (8thCir 1998)).

[¶28.] In a pretrial motions hearing, the court addressed the admissibility of Kindall's out-of-court statements that the State sought to use. The court found substantial evidence of a conspiracy and that the statements were made while the conspiracy was continuing. The crux of defendant's argument was that the statements were not made *in furtherance* of the conspiracy, and were, therefore, inadmissible. The court examined each statement challenged by defendant and made a specific finding on whether it satisfied SDCL 19-16-3(5). At trial not all the statements previously found to be admissible by the court were offered.[4] Therefore, we examine only those statements used in trial.[5]

[¶29.] **First statement as offered at the motions hearing**: *"Kindall just laughed and was real jovial about it in calling him [Klug] a puss and that he was weak."* According to the court, this statement was made in furtherance of the conspiracy because it was made to induce defendant's continued participation in the ongoing crime. The above-quoted statement was not specifically used at trial. Instead, it was testified that Kindall *"thought he [Klug] was weak and she was*

---

4. The State referred to a statement during its opening remarks that was not later offered during the trial. However, because the court informed the jury that opening remarks are not evidence, we need not examine the statement.

5. The State contends that even if we find certain statements were admitted in error we should examine them for admissibility under SDCL 19-16-3(1), defendant's own statements. The State did not raise this argument below. Because the circuit court did not have an opportunity to rule on the admissibility of the statements under that subsection, this Court will not address the argument. *See* State v. Hays, 1999 SD 89, ¶16, 598 NW2d 200, 203.

*really hung up about her money.*" On appeal, defendant contends that the statement was inadmissible because it was merely Kindall bragging, which does not further the conspiracy. For the statement to be admissible there need only be a reasonable basis that it was made in furtherance of the conspiracy. *Smith*, 353 NW2d at 343. We think that it was reasonable to conclude that Kindall made this statement to enlist Cook to join the conspiracy or to keep defendant in on it.

[¶30.]     **Second statement as offered at the motions hearing**: "*She said that he owed them money from drug transactions that have occurred in the—prior to that night.*" The statement that was ultimately used at trial was that "*they [defendant and Kindall] started talking about—going on about a guy in Rapid City that they knew had owed them money. . . . They said that the kid owed them money.*" According to the court, the first statement was admissible because it "explained the nature of the conspiracy to kidnap Klug and collect the drug debt." Explaining the nature of the conspiracy, however, does not provide a reasonable basis for concluding that the statement was made in *furtherance* of the conspiracy. This statement, while made when the conspiracy was continuing, was not made (1) to enlist someone to join the conspiracy; (2) to advance the aims of the conspiracy; (3) to allay suspicion; or (4) as a narrative statement by one conspirator to another about what each had done. *See Smith*, 353 NW2d at 343-44 (citing United States v. Handy, 668 F2d 407, 408 (8thCir 1982); United States v. Miller, 664 F2d 94, 98

(5thCir 1981); United States v. James, 510 F2d 546, 549 (5thCir 1975); United States v. Overshon, 494 F2d 894, 898-99 (8thCir 1974); United States v. Halpin, 374 F2d 493, 495-96 (7thCir 1967)).  The court erred in admitting this statement.

[¶31.]     **Third statement as offered at the motions hearing**:  *"When they came in the house, they were—when we first started talking, they were upset about [Klug] being a snitch and they wanted to tattoo the name 'cop caller' around his neck."*  At trial, Cook stated that *"they" were calling him a "snitch and a rat. . . . They asked me if I knew any tattooist because they wanted to get this guy [Klug] tattooed 'cop caller' around his neck."*  The court concluded that the statement was admissible because it was made to "induce [defendant's] continued participation in the conspiracy. . . .  The statement was made to remind [defendant] that Klug gave information to police and to entice [defendant] to carry out the plan."  We think it was a reasonable conclusion that the statement was made by Kindall to enlist defendant's continued participation in the conspiracy.

[¶32.]     **Fourth statement as offered at the motions hearing**:  *"Well, isn't it [Klug's]? . . .  Well, then it's ours now."*  At trial, Beebe testified that Kindall said, *"Well, if it's [Klug's], it's ours now."*  According to the court, the statement was made in furtherance of the conspiracy because it was made to "explain Kindall's belief that she was entitled to Klug's property to settle a drug debt."  This conclusion seems strained because it does not establish how the statement was made to further the conspiracy.  It was not made to entice Beebe to join the conspiracy; nor was it made to keep defendant enlisted.  It neither was made to allay Beebe's suspicions, nor as a narrative statement to defendant about what she had done.  *See Smith*, 353

-16-

NW2d at 343-44 (citations omitted). On the other hand, it might be considered a statement in furtherance of the conspiracy because it suggests that Kindall and defendant were still in the process of collecting on the debt Klug allegedly owed. We cannot conclude that admitting this statement was clearly erroneous.

[¶33.] **Fifth statement as offered at the motions hearing**: *"She [Kindall] said that he did come there [Kindall's house], that she sent him away, and told him to leave, and that she hadn't seen him since. . . . And she said that [Klug] would no longer be a problem for her. And she's like, isn't that right, Tory? And Tory's like, 'yeah, we have that taken care of.'"* At trial, Beebe stated that Kindall said, *"Well, he [Klug] came to my house, but you know, I sent him away. I told him to leave. . . . They [defendant and Kindall] said he was no longer a problem for them. That it was taken care of."* Beebe also testified that Kindall said, *"Isn't that right Tory?"*, to which defendant responded, *"Yes."* The court found Beebe's statements to be in furtherance of the conspiracy because it was intended to "calm Beebe's fears about Klug." Statements made to "allay suspicion" are admissible; therefore, the statements were not admitted in error. *See Smith*, 353 NW2d at 343-44 (citations omitted).

[¶34.] **Sixth statement as offered at the motions hearing**: *"Oh, honey, no, it's okay. Don't worry about it. Just come on, get up. I need you to come with me. . . . Honey, I'm going to go away to a cabin for a little while. I need you to come with me. . . . Well, if anything happens or if you get any worse or anything . . . ."* At trial, Beebe claimed that Kindall said, *"Honey, I need you to come with me. I got to go away for awhile and I need you to go with me. . . . I'm going away to a cabin. . . .*

*I need you to come with me."* Beebe then testified that defendant said, *"We don't have time for this. We got to go. . . . Just leave her. She's not worth it. We got to go."* The court found the statements to be admissible because "they were made in an effort to further the conspiracy or conceal its existence[.]" According to the court, "[t]here is a reasonable basis to believe that [defendant] and Kindall intended to take Beebe with them as part of their efforts to conceal the crime." It is reasonable to conclude that the statements were made in an effort to allay Beebe's suspicions, conceal the crime, or enlist her in the conspiracy. *See Smith*, 353 NW2d at 343-44 (citations omitted). The court did not err in finding the statements admissible.

[¶35.]     **Seventh statement as offered at the motions hearing**: *"Yeah, I washed it in cold water."* This was Kindall's response to defendant's question about washing clothes when they were in North Dakota, a statement that Keefe overheard and testified to. The circuit court concluded that the statement was admissible because it was made in an effort to conceal the evidence of the crime. It is reasonable to deduce that this statement was made to further the conspiracy, which was to kidnap Klug and take him out of their lives forever. Cleaning up the evidence furthers that goal.[6]

---

6.     As stated in McCormick on Evidence, § 267 at 645 (2d ed):

> Literally applied, the "in furtherance" requirement calls for general exclusion of statements possessing evidential value solely as admissions, yet in fact more emphasis seems to be placed upon the "during continuation" aspect and any statements so qualifying in point of time may be admitted in evidence without such regard to whether it in fact furthers the conspiracy. . . . Both the "in furtherance" and the "during continuation" requirement call for exclusion of admissions and confessions made after the termination of the conspiracy. Questions arise, of course, as to when termination occurs. Under certain

(continued . . .)

[¶36.]  **Eighth statement as offered at the motions hearing**: *"She said that it should have been cleaned five days ago."*  Keefe also testified to this statement, and the court found it admissible because it was made in an effort to conceal the crime.  This statement, however, is a narrative statement about what should have been done in the past.  Yet the statement was made during the process of cleaning up evidence of the crime, and suggests continuation of the conspiracy.  We cannot say that it was clearly erroneous to admit this statement.

[¶37.]  Even if some of the statements defendant challenges should not have been admitted, he has not alleged nor shown how he was prejudiced by these admissions.  He simply claims that they were inadmissible and we should reverse and grant a new trial.  Not every error requires reversal.  "[I]f the State shows beyond a reasonable doubt that the error was not prejudicial" it is considered harmless.  *Stanga*, 2000 SD 129, ¶20, 617 NW2d at 491 (citations omitted).

[¶38.]  Even without these statements, there is overwhelming evidence supporting the verdict.  Cook testified that defendant took him to the trunk of Kindall's vehicle and showed him Klug inside.  Klug's legs and hands were bound with duct tape, and defendant punched Klug in the back, yelling, "wake up mother fucker."  Cook then testified that the next day he asked defendant what happened

_____

(. . . continued)

circumstances, extending the duration of the conspiracy beyond the commission of the principal crime to include concomitant and closely connected disposition of its fruits or concealment of its traces appears justifiable, as in the case of police officers who engage in writing up a false report to conceal police participation in a burglary or disposal of the body after a murder.

to the person in the trunk, to which defendant responded that he put him in a toolbox and left him there all day. That day was extremely hot and Cook asked defendant if Klug was given water. Defendant responded that he was not, and that it would have been too late anyway. There was also DNA evidence strongly tending to prove that Klug was in fact in Kindall's trunk.

[¶39.] Finally, there were the jailhouse notes written by defendant to Cook. In the notes, defendant stated, "Oh Yeah, even if they do find some so called physical evidence, where the hell are they going to get there [sic] DNA to compair [sic] it to? . . . And Believe Me they ain't gonna find No body unless some one else planted somebody. It may have taken me a while to decide what to do but once I figured it out, it was the best plan, and I executed it with "grinding" precision! Don't worry about them finding a body." In a subsequent letter, defendant stated, "Yeah, You know that was one of the nastiest things I have ever done . . . . one of the Nastiest. If a guys gonna make fish food he just as well put it in bite size pieces Right! What the hell it wasn't my first rodeo and I'm sure it won't be my last if I stay in the business I've been in." Considering the overwhelming evidence of guilt against defendant, we conclude that Kindall's out-of-court statements, even if admitted in error, were not prejudicial.

### 4. Admitting Statements of Incompetent Co-Conspirator

[¶40.] According to defendant, because Kindall was found incompetent to stand trial, her out-of-court statements should not have been admitted against him under SDCL 19-16-3(5) because one cannot conspire with an incompetent person. Defendant has not directed this Court to any authority to support his proposition

that when one is found incompetent to stand trial, that person was incapable of earlier conspiring to commit a crime. Rather, he argues that because Kindall was found incompetent to stand trial, based on mental conditions she obviously suffered from for a while, she must also have been incapable of entering into the criminal agreement required in this case.

[¶41.] Kindall was found incompetent to stand trial by the circuit court. Although Kindall had a history of brain injury and mental illness, nothing in the circuit court's findings declaring Kindall incompetent to stand trial would suggest that she was insane at the time she conspired with defendant. Indeed, Kindall's sanity at the time she entered into the criminal agreement with defendant to kidnap Klug has not been raised.[7] "Incompetency to stand trial and incapacity to commit a crime because of insanity are, of course, distinct and separate issues." State v. Jones, 406 NW2d 366, 369 (SD 1987); *see also* State v. Rough Surface, 440 NW2d 746, 757 (SD 1989). Defendant cites no authority for the proposition that a person found incompetent to stand trial cannot be considered a responsible criminal conspirator at an earlier occasion. Defendant's argument on this question is meritless.

### 5. Defendant's Right to Confront and Cross-Examine Witnesses

[¶42.] Defendant claims that because Kindall was not available to testify at trial, the court erred when it admitted her out-of-court statements. Defendant

---

7. This Court takes judicial notice of Pennington County criminal file number 04-3272, in which it is recorded that Kindall has since been found competent to stand trial.

raised this issue with the circuit court at the December 21, 2004 motion hearing. The court took the issue under advisement and never entered an oral or written ruling on the motion. Defendant failed to raise the issue again. At oral argument, however, appellate counsel insisted that because a general objection was made to Kindall's statements and the trial court prohibited "speaking objections," the general objection was adequate to preserve the question for appeal. Ordinarily, this would not be sufficient to avoid waiver of the issue. *See Hays,* 1999 SD 89, ¶16, 598 NW2d at 203.

[¶43.] Nevertheless, because of the importance of this question, we exercise our discretion to consider it. In *Crawford v. Washington,* the United States Supreme Court ruled that the Confrontation Clause applies to "witnesses," "those who bear testimony." 541 US 36, 51, 124 SCt 1354, 1364, 158 LEd2d 177 (2004). In that light, the Court stated that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* Therefore, the Confrontation Clause implicates a "core class" of testimonial statements:

> "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," White v. Illinois, 502 US 346, 365, 112 SCt 736, 116 LEd2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . .

*Id.* at 51-52, 124 SCt at 1364, 158 LEd2d 177.

[¶44.]     Although there are exceptions to the hearsay rule, the Court recognized that historically "there is scant evidence that exceptions were invoked to admit *testimonial* statements against the accused in a *criminal* case." *Id.* at 55-56, 124 SCt at 1367, 158 LEd2d 177. Nevertheless, the Court concluded that not considered as "testimonial" statements were those made in furtherance of a conspiracy. *Id.* at 56, 124 SCt at 1367, 158 LEd2d 177 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy.").

[¶45.]     In *United States v. Inadi*, 475 US 387, 394-96, 106 SCt 1121, 1125-26, 89 LEd2d 390 (1986), the Supreme Court first recognized that statements made by a co-conspirator in furtherance of a conspiracy are not testimonial, and therefore, are admissible even when the declarant is unavailable. Specifically, the Court stated, "There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements." *Id.*

> Because [the statements] are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. When the Government   as here   offers the statement of one drug dealer to another in furtherance of an illegal conspiracy, the statement often will derive its significance from the circumstances in which it was made. Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand. Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy. . . .

> The declarant himself may be facing indictment or trial, in which case he has little incentive to aid the prosecution, and yet will be equally wary of coming to the aid of his former partners in crime. In that situation, it is extremely unlikely that in-court testimony will recapture the evidentiary significance of statements made when the conspiracy was operating in full force.

*Id.* at 395, 106 SCt at 1126, 89 LEd2d 390. Since *Crawford,* multiple courts have recognized that statements made in furtherance of a conspiracy are not *testimonial.* United States v. Ramirez, 479 F3d 1229, 1249 (10thCir 2007) (citing *Crawford,* 541 US at 56, 124 SCt at 1367, 158 LEd2d 177); United States v. Sullivan, 455 F3d 248, 258 (4thCir 2006) (citation omitted); United States v. Allen, 425 F3d 1231, 1235 (9thCir 2005) (citation omitted); United States v. Lee, 374 F3d 637, 644 (8thCir 2004).

[¶46.] Here, although Kindall was unavailable, defendant's Sixth Amendment rights were not violated when her statements were admitted at trial. Kindall was a co-conspirator and her statements were not testimonial. They were made in furtherance of the conspiracy. Therefore, we find no error.

### 6. Defendant's Sentence

[¶47.] Defendant contends that his sentence of 100 years is grossly disproportionate to the crime of kidnapping, because the court considered the uncharged crime of murder. According to defendant, because the court expressed that defendant likely killed Klug and destroyed the body, the court went beyond the

scope permitted in sentencing for a kidnapping conviction.[8] Defendant cites no authority prohibiting a court from considering uncharged conduct, or the probable consequences of defendant's acts. A court is permitted to consider uncharged conduct when acquainting itself with the character of the defendant for sentencing.

---

8. In its oral sentence the court stated:

> In this case, the [c]ourt has looked at a number of factors including the gravity of the offense. This [c]ourt presided over the trial and listened to and evaluated the credibility and the demeanor of each and every one of the witnesses that testified. The [c]ourt has considered the effect of this crime of kidnapping on the victim, Troy Klug, and Troy's family. The evidence establishes that Troy was bound, beaten, detained in the trunk of a car in sweltering heat, duct taped. That he was then transferred to a toolbox where he was intermittently beaten until his death. He suffered terror, loneliness, misery and death. His body was destroyed and concealed. He was denied a burial. . . .
>
> In analyzing this rehabilitation factor, the Supreme Court has said that a defendant's remorse and his prospect for rehabilitation are proper considerations in sentencing. After exercising your right to a trial, a defendant's continued refusal to take accountability may be considered as a sign of a lack of remorse. . . . In your statement to the [c]ourt you told the [c]ourt, "yes, I should take responsibility" and you told the [c]ourt you used methamphetamine. Beyond that you did not take responsibility for the crime. Now the [c]ourt considers as perhaps one of the reasons is the fact that further criminal charges for murder or manslaughter could be brought against you. The [c]ourt considers that as a possible explanation. Nevertheless, your decision to not accept responsibility, not to disclose the location of the body is a factor that can and is considered—can be and is considered by this [c]ourt. . . .
>
> Your conduct thus far indicates to the [c]ourt that your plan for rehabilitation is to persist in your denial, bully others while in prison and keep secret the location of Troy's body, continuing to conceal your involvement in this crime. . . .
>
> The jury found that you kidnapped Troy Klug. The legislature imposed wide discretion for trial courts in sentencing and the reason for that is there are different kinds of kidnapping. In this kidnapping
>
> (continued . . .)

*McKinney*, 2005 SD 74, ¶17, 699 NW2d at 465-66; *see also* State v. McCary, 2004 SD 18, ¶8, 676 NW2d 116, 120; State v. Arabie, 2003 SD 57, ¶21, 663 NW2d 250, 257.

[¶48.]     We find nothing in the record to suggest that defendant's sentence was grossly disproportionate.  It is within the statutory maximum of life imprisonment.  *See* SDCL 22-19-1(3); *see also Bonner*, 1998 SD 30, ¶17, 577 NW2d at 580.

[¶49.]     Affirmed.

[¶50.]     GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.

_____
(. . . continued)
the victim was placed at enormous risk and all the evidence establishes, suffered a horrible death at your hands.