#25086-rev & rem-JKK

**2010 SD 33**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN RE:  A.L. and S.L.-Z.,

Minor Children,

DAVID and JOYCE ZIMMER,

Petitioners and Appellees,

v.

SCOTT and MARIA ZIMMER,

Respondents and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE FIRST JUDICIAL CIRCUIT
CLAY COUNTY, SOUTH DAKOTA

* * * *

HONORABLE STEVEN R. JENSEN
Judge

* * * *

THOMAS H. FRIEBERG of
Frieberg, Nelson & Ask, LLP
Beresford, South Dakota

Attorneys for petitioners
and appellees.

CRAIG K. THOMPSON
Vermillion, South Dakota

Attorney for respondents
and appellants.

* * * *

ARGUED ON OCTOBER 7, 2009

OPINION FILED **04/14/10**

#25086

KONENKAMP, Justice

[¶1.] In this dispute over grandparent visitation, we are confronted with the question of what due process safeguards a court must apply in weighing a parental decision to deny visitation. When the grandparents petitioned the circuit court for visitation, both parents opposed asserting that it would harm the children and significantly interfere with their parent-child relationship. But the court concluded that the parents' opposition was unreasonable and not in the best interests of the children. It allowed two annual, seven-day visits in California. Because a court must give deference to the parents' decision and apply the "special weight" and "special factors" analysis required by the United States Supreme Court, we reverse and remand for further proceedings.

## Background

[¶2.] Scott and Maria Zimmer have two children, A.L., born July 20, 1999, and S.L.-Z., born May 10, 2005. Scott's parents, David and Joyce Zimmer, live in Vermillion. When Scott graduated from the University of South Dakota, he moved to California. He chose California as a place to distance himself from his parents. Scott and his parents have been in long-standing conflict.

[¶3.] Despite these tensions, after A.L. was born, David and Joyce traveled several times to California to visit their grandchild. One visit, at A.L.'s first Christmas, resulted in a six-month rift between Scott and his parents. During another visit, in July of 2000, Maria refused to speak with David and Joyce. But Scott was able to communicate with his parents, and they were able to visit A.L.

-1-

Over the years, David and Joyce continued to visit Scott, Maria, and A.L. in California, although the relationship remained strained.

[¶4.]     At the time of A.L.'s third birthday, however, an incident between Scott and Joyce resulted in a two-year estrangement. David and Joyce had purchased plane tickets for Scott, Maria, and A.L. to visit them in South Dakota. During the visit, Scott believed that Joyce had interjected herself into his discipline of A.L. Since the incident took place in A.L.'s presence, Scott saw this as a direct challenge to his parenting. Infuriated, he sent his parents an expletive-filled email, saying he wanted no further contact with them unless they first obtained "a minimum of 6 months of individual and couples therapy."

[¶5.]     Even with the clashes Scott had with his parents, Maria, in keeping with her cultural heritage of cherishing extended family, sought to maintain a connection with David and Joyce. While Scott remained detached, she facilitated all contact with the grandparents. David and Joyce would come to California, speak only with Maria, and arrange visitation. A.L. would sometimes spend the night with his grandparents.

[¶6.]     In 2005, prompted by their financial difficulties, Scott and Maria decided to move to South Dakota. According to Scott, in addition to economics, the move was also contemplated because Maria's mother, who previously lived with them, had moved to Mexico. David and Joyce assisted Scott and Maria in the move and helped them prepare their condominium for sale. In May 2006, Scott and Maria moved to Vermillion. They lived with David and Joyce for six weeks. David and Joyce helped Scott and Maria purchase their home. Although Scott and Maria

had sufficient money for a down payment, they could not obtain a loan. David and Joyce cosigned the note.

[¶7.]    For a time, there were no major upheavals, but tensions remained. One source of friction was David's smoking habit. In the spring of 2007, Maria tried to talk to Joyce about A.L.'s asthma and his need to avoid cigarette smoke. Joyce responded defensively, saying that David would never stop smoking, and therefore, if smoking became an obstacle she would never see her grandchildren again. This generated several tense email exchanges.

[¶8.]    Another incident occurred after Scott wrote a letter to his grandparents (Joyce's parents) explaining that he wanted to continue to have a relationship with them, but did not think he could continue to have a relationship with his parents. When David and Joyce learned of this letter, David went to Scott and Maria's home at ten one evening and knocked on their basement door. Scott and Maria did not answer, thinking it was a prankster. But the knocking continued, and A.L. and S.L.-Z. became scared. When Scott finally answered the door, David asked Scott to come outside. Scott refused. Then, with the children in earshot, David berated Scott. David ended with, "Have a nice life, monster."

[¶9.]    After that episode, Scott and Maria cut off all contact with their children and the grandparents. Two months later, in August or September 2007, Scott and Maria prepared to sell their home and move back to California. According to Scott, David and Joyce would not cooperate with the sale (their names were on the loan), unless Scott and Maria met with them, discussed visitation, and resolved all issues between them. When Scott and Maria began to notice that David and

Joyce were driving by their house when the children were outside playing, they instructed their children to turn their backs on their grandparents as they drove by.

[¶10.]     In January 2008, Joyce and Maria were at the same restaurant for a knitting group they both belonged to. Maria recounted that Joyce called David to come to the restaurant. Once David was there, Maria claims that Joyce began pointing at her and S.L.-Z. and attempted to interact with them. During this exchange, David and Joyce learned that A.L. was with Scott. They went to Scott's workplace and refused to leave. Scott threatened to have them removed; Joyce threatened to file assault charges. This confrontation occurred in front of A.L., then age 8.

[¶11.]     In May 2008, David and Joyce petitioned the circuit court for grandparent visitation under SDCL 25-4-52. They asserted that visitation was in the children's best interests and that Scott and Maria denied them a reasonable opportunity to visit their grandchildren. They also alleged that visitation would not significantly interfere with the parent-child relationship.

[¶12.]     Scott and Maria opposed the petition contending the visitation would significantly interfere with their parent-child relationship because of David and Joyce's demeaning comments and continual challenges to their parental authority in front of the children. They also alleged that it was not in the best interests of the children to continue to have contact with their grandparents because David and Joyce would exact the same emotional damage on the children that they had inflicted on Scott.

[¶13.] An evidentiary hearing was held, at which David and Joyce, their friends, and Scott and Maria testified. After the hearing, Scott and Maria moved to California. The court ordered that David and Joyce be allowed two, seven-day visits with the children each year in California. Included would be one overnight with the children during each seven-day period. David and Joyce were ordered not to comment on their relationship with Scott and Maria, and David was ordered not to smoke in the children's presence. Scott and Maria appeal.[1]

### Analysis and Decision

[¶14.] Scott and Maria contend that because they are fit parents, a court "cannot and should not interfere to question their ability to make decisions regarding the rearing of their children." In *Troxel v. Granville*, the United States Supreme Court ruled that "so long as a parent adequately cares for his or her children (i.e., is fit) there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." 530 US 57, 68, 120 SCt 2054, 2061, 147 LEd2d 49 (2000). In its findings, the circuit court ruled that "David and Joyce Zimmer have had significant contact with the grandchildren over the years and do have a bonded relationship with both grandchildren, particularly with A.L.," that "Scott and Maria have unreasonably denied David and

---

1. Standard of Review: "We review the circuit court's findings of fact under the clearly erroneous standard, giving due regard to the 'court's opportunity to judge the credibility of the witnesses.'" *In re* L.S., 2006 SD 76, ¶31, 721 NW2d 83, 92 (quoting *In re* T.G., 1998 SD 54, ¶16, 578 NW2d 921, 923 (citation omitted)). A claim of a constitutional violation is reviewed de novo. State v. Tiegen, 2008 SD 6, ¶14, 744 NW2d 578, 585 (citations omitted).

Joyce Zimmer the opportunity to have visitation with their grandchildren," that

Scott and Maria's decision "to deny visitation was not reasonable based upon the

totality of circumstances," that "the complete denial of visitation by Scott and Maria

is not reasonable nor in the best interest of the children or the circumstances," and

that "the best interest of the children requires that they have continued and

ongoing visitation with their grandparents, provided the grandparents do not

discuss their relationship with Scott and Maria during periods of visitation." The

court made no finding on parental fitness, but there was no contention that Scott

and Maria are unfit.

[¶15.]    Under SDCL 25-4-52, a circuit court has authority to order

grandparent visitation.

> The circuit court may grant grandparents reasonable rights of
> visitation with their grandchild, with or without petition by the
> grandparents, if the visitation is in the best interests of the
> grandchild and:
>
> (1) If the visitation will not significantly interfere with the
> parent-child relationship; or
>
> (2) If the parent or custodian of the grandchild has denied or
> prevented the grandparent reasonable opportunity to visit the
> grandchild.

*Id.*

[¶16.]    Nothing in the circuit court's written findings or conclusions indicates

that the court gave any special weight to the parents' decision, although in its oral

comments the court mentioned several times that the parents' decision merited

deference and special weight. But even then the special weight element appeared to

be limited in the court's remarks to whether there were "safety or health" risks the

grandparents might pose. Those observations seemingly placed the onus on the parents to show why their decision should be honored. *See* Medearis v. Whiting, 2005 SD 42, ¶¶14, 23, 695 NW2d 226, 230, 232 (mother asserted, and this Court agreed that the court improperly placed burden on her).

[¶17.] The circuit court made no finding on the first factor in SDCL 25-4-52, whether "visitation will not significantly interfere with the parent-child relationship." *See* SDCL 25-4-52(1). Basing its decision solely on the second statutory factor, the court found that Scott and Maria "denied or prevented the grandparent[s] reasonable opportunity to visit the grandchild[ren]." *See* SDCL 25-4-52(2). Since the court found that Scott and Maria denied the grandparents reasonable visitation, our statute requires no consideration of whether visitation would significantly interfere with the parent-child relationship. The two statutory factors stand in the disjunctive.[2] In this regard, the court appears to have followed our precedent.

[¶18.] In 2002, we upheld most of South Dakota's grandparent visitation statute. Currey v. Currey, 2002 SD 98, ¶13, 650 NW2d 273, 277 (placing burden of proof on grandparents so as to avoid unconstitutionality); *see also Medearis*, 2005

---

2. Scott and Maria argue that SDCL 25-4-52 is unconstitutional because the court was not required to consider whether visitation would significantly interfere with their parent-child relationship. Under SDCL 25-4-52, the court must find first that visitation is in the children's best interests, and second, *either* that visitation would not significantly interfere with the parent-child relationship *or* that the parents have denied the grandparents a reasonable opportunity for visitation. Although the statute might well have stood on firmer constitutional ground if an "and" instead of an "or" had been placed between subsections (1) and (2), in view of our holding that the statute

(continued . . .)

SD 42, ¶16, 695 NW2d at 230.  In *Currey*, we noted that unlike the Washington statute in *Troxel*, South Dakota's grandparent visitation statute "does not allow any individual to petition for visitation nor does it deprive the custodial parent of the fundamental right to make decisions concerning the care, custody, and control of the children."  2002 SD 98, ¶13, 650 NW2d at 277 (emphasis omitted).

[¶19.]      While we have ruled this statute constitutional, that does not necessarily preclude us from finding the statute unconstitutional as applied to the facts of this case.  *See Troxel*, 530 US at 75, 120 SCt at 2065, 147 LEd2d 49 (statute unconstitutional as applied).  "[A] court may apply a sufficient statute in an unconstitutional manner."  Punsly v. Ho, 87 CalApp4th 1099, 1104 (2001).  "The practical effect of holding a statute unconstitutional 'as applied' is to prevent its future application in a similar context, but not to render it utterly inoperative."  People v. Rodriguez, 66 CalApp4th 157, 167 (1998) (quoting Ada v. Guam Soc'y of Obstetricians and Gynecologists, 506 US 1011, 1012, 113 SCt 633, 634, 121 LEd2d 564 (1992) (Scalia, J., dissenting)); *see also* Crafton v. Gibson, 752 NE2d 78, 92 (IndCtApp 2001).  Thus, even though this Court has found the statute facially sufficient, it must still be applied in a constitutional manner to comply with *Troxel's* mandate.  When faced with more than one possible statutory interpretation, our duty is to choose the interpretation, if feasible, that will uphold the validity of the statute.  State v. Allison, 2000 SD 21, ¶5, 607 NW2d 1, 2 (citation omitted).  Other

_____

(. . . continued)
    was unconstitutionally applied, the issue is subsumed in our ruling
    incorporating into the statute the *Troxel* requirements.

jurisdictions have similarly interpreted their nonparent visitation statutes in such a way as to conform with *Troxel's* minimum requirements.[3]

[¶20.] To apply our grandparent visitation statute constitutionally, three pieces from *Troxel* must be accommodated. First, parents have a "liberty interest" in the rearing of their children. *Troxel*, 530 US at 65, 120 SCt at 2060, 147 LEd2d 49. Fit parents are presumed to act in the best interests of their children. *Id.* Second, given a parent's liberty interest in childrearing, the state will "normally" have no reason to question parental decisions. *Id.* at 68, 120 SCt at 2061, 147 LEd2d 49. *Troxel* emphasized that its ruling did not rest on a fit parent's "normal" right to be free of state intervention in parenting decisions, but instead rested on a "combination of . . . factors." *Id.* at 68, 71, 120 SCt at 2060, 2063, 147 LEd2d 49. Third, the Court established a "special-weight" requirement. *Id.* at 70, 120 SCt at 2062, 147 LEd2d 49. The trial court in *Troxel* failed to give "at least some special weight" to the mother's "determination of her daughters' best interests." *Id.* at 70, 120 SCt at 2062, 2063, 147 LEd2d 49. This "special-weight" prerequisite was highlighted in Justice Zinter's concurrence in *Currey*. *See* 2002 SD 98, ¶25, 650 NW2d at 279 (Zinter, J., concurring); *see also Medearis*, 2005 SD 42, ¶18, 695 NW2d

---

3. J.W.J., Jr. v. P.K.R., 976 So2d 1035, 1039-40 (AlaCtApp 2007); McGovern v. McGovern, 33 P3d 506, 511-12 (ArizCtApp 2001); Barry v. McDaniel, 934 So2d 69, 76-77 (LaCtApp 2006); Rideout v. Riendeau, 761 A2d 291, 299-300 (Me 2000); Koshko v. Haining, 921 A2d 171, 184 (Md 2007) (to save grandparent visitation statute from invalidation, the court must read into the statute the parental presumption); SooHoo v. Johnson, 731 NW2d 815, 824 (Minn 2007); Deem v. Lobato, 96 P3d 1186, 1191-92 (NMCtApp 2004); E.S. v. P.D., 863 NE2d 100, 106 (NYCtApp 2007); Glidden v. Conley, 820 A2d 197, 204-05 (Vt 2003).

at 231. In light of *Troxel*, the best interests determination cannot be left solely to the trial court's discretion without considering and giving deference to a fit parent's decision. 530 US at 67, 72-73, 120 SCt at 2060, 2064, 147 LEd2d 49.

[¶21.]    In *Troxel*, the Supreme Court noted that the mother consented to some grandparent visitation, but proposed something less than the grandparents wanted. 530 US at 71, 120 SCt at 2063, 147 LEd2d 49. The Court observed disapprovingly that rather than deferring to the mother's wishes the trial court imposed its own visitation schedule. *Id*. at 69, 120 SCt at 2062, 147 LEd2d 49. From this we deduce that either the statute, by its terms, must generally defer to a parent's wishes or a court must defer, by dint of the facts, to the terms of a parent's offer. Thus, the fact that the parent offers some visitation becomes part of the analysis.[4] There is a qualitative difference between disagreement on the amount of visitation as opposed to denial of any access. In the latter instance, a grandparent would be pursuing the right to have a relationship with the child, while, in the former case, the divergence is merely over how much visitation is appropriate.

[¶22.]    We believe that our Legislature placed the "best interests of the child" standard in the grandparent visitation statute to grant courts the authority, over parental objection, to impose grandparent visitation in appropriate cases, so long as the visitation complies with constitutional limitations. *See In re* Adoption of C.A.,

---

4.    Joan Catherine Bohl, *That "Thorny Issue" Redux: California Grandparent Visitation Law in the Wake of Troxel v. Granville*, 36 GoldenGateULRev 121, 141-42 (2006).

137 P3d 318, 326-28 (Colo 2006). While the *Troxel* plurality recognized that only in limited circumstances should a state intervene in a fit parent's decision, the Court did not declare that grandparent visitation should never be allowed when a fit parent makes a decision to deny or restrict visitation.[5] Rather, the Supreme Court emphasized that a parent's decision regarding the best interests of his or her child must be given special weight: "The problem here is not that the [court] intervened, but that when it did so, it gave no special weight at all to [the mother's] determination of her daughters' best interests." *Troxel*, 530 US at 58, 120 SCt at 2056, 147 LEd2d 49; *see also Medearis*, 2005 SD 42, ¶18, 695 NW2d at 231. When a court goes no further than to conclude that visitation is in the best interests of the child, the court has neither given special weight to the parent's decision nor applied the presumption that the fit parent's choice, as opposed to the court's choice, is in the best interests of the child. In most instances, parents must have the final word. Disputes between parents and grandparents on visitation are not contests between equals. *See* Stacy v. Ross, 798 So2d 1275, 1280 (Miss 2001); *Glidden*, 820 A2d at 205.

[¶23.]     To accommodate both our Legislature's best interests standard and *Troxel's* "special-weight" and "special-factors" requirements, a court, before ordering

---

5.     *See Adoption of C.A.*, 137 P3d at 326-28 (special weight requirement does not insulate parental wishes from judicial review); *Deem*, 96 P3d at 1190 (nothing in *Troxel* suggests that the Supreme Court considered the presumption that a fit parent acts in the best interests of his or her child to be other than a rebuttable presumption); Harrold v. Collier, 836 NE2d 1165, 1172 (Ohio 2005) (nothing in *Troxel* indicates that the fit parent presumption is irrefutable); *Crafton*, 752 NE2d at 96-97 (same).

grandparent visitation under SDCL 25-4-52, must (1) presume that a fit parent acts in his or her child's best interests, (2) give special weight to a fit parent's decision to deny or limit visitation, (3) consider whether the parent has completely denied visitation or simply limited visitation, (4) shift the burden to the parent to offer evidence in support of the parent's decision only if the grandparents overcome the parental presumption, and (5) require the grandparents to bear the ultimate burden of establishing by clear and convincing evidence that special factors exist showing that the visitation they seek is in the child's best interests.[6] *See* Evans v. McTaggart, 88 P3d 1078, 1083 (Alaska 2004) (clear and convincing proof required, except where the choice is plainly contrary to child's best interests); *Adoption of C.A.*, 137 P3d at 328-29 (clear and convincing burden is needed to comply with due process rights of parents); Polasek v. Omura, 136 P3d 519, 522-23 (Mont 2006) (same); Hamit v. Hamit, 715 NW2d 512, 528 (Neb 2006) (clear and convincing); *see also* Spaulding v. Williams, 793 NE2d 252, 260 (IndCtApp 2003).

[¶24.]     If a court orders grandparent visitation, it must make findings of fact and conclusions of law identifying the "special factors" on which it relies. *See Troxel*, 530 US at 68, 120 SCt at 2061, 147 LEd2d 49 (courts should consider and resolve those "special factors that might justify the State's interference" with the parents' decision). Special factors might include, but are not limited to, such

---

6.     We express no opinion on how these standards should be applied in a grandparent visitation proceeding where the objecting parent is unfit, or where both parents are fit but one opposes the petition and the other does not. Those questions and others must be left to future cases. As Justice O'Connor cautioned, "the constitutional protections in this area are best 'elaborated with care.'" *Troxel*, 530 US at 73, 120 SCt at 2064, 147 LEd2d 49.

matters as physical or emotional harm to the grandchild if visitation is denied or limited, preference for grandparent visitation expressed by a child of sufficient age, or some other compelling circumstance warranting state interference in parental decision making. *See Troxel*, 530 US at 72-74, 120 SCt at 2063-64, 147 LEd2d 49. But it is not sufficient that grandparents seek visitation by mere assertion that the grandchild will gain some benefit. *See* Lulay v. Lulay, 739 NE2d 521, 533 (Ill 2000). Generalities about the positive influence grandparents have on their grandchildren fall short of the necessary showing for government interference with parental decisions. *See Glidden*, 820 A2d at 205.

[¶25.] This case and many others like it bear witness to the terrible emotional and financial costs suffered in grandparent visitation disputes. Ideally, loving grandparents should always be a part of their grandchildren's lives. Yet it remains a painful dilemma for courts whether forcing visitation against parental wishes serves children torn between family factions. Ordinarily, though, we must defer to the fundamental rights our constitution affords to the choices parents make, even if we might deem those choices regrettable. Although we continue to uphold our grandparent visitation statute as facially constitutional, we conclude that the circuit court applied the statute unconstitutionally by failing to employ the parental presumption, as well as the compulsory "special-weight" and "special-factors" analysis, before ordering visitation over the parents' objections. Accordingly, we reverse the judgment of the circuit court and remand for further proceedings consistent with this decision.

[¶26.] Reversed and remanded.

[¶27.]        GILBERTSON, Chief Justice, and ZINTER, MEIERHENRY, and

SEVERSON, Justices, concur.