#28487-aff & rem-JKK
**2019 S.D. 25**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

NATHAN SCOTT,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON SOGN
Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

QUINCY R. KJERSTAD
Assistant Attorney General                          Attorneys for plaintiff
Pierre, South Dakota                          and appellee.


MARK KADI of
Minnehaha County Office of the
   Public Advocate                          Attorneys for defendant
Sioux Falls, South Dakota                          and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS ON
FEBRUARY 19, 2019
OPINION FILED **04/24/19**

#28487

KONENKAMP, Retired Justice

[¶1.]     A jury found Nathan Scott guilty of aggravated assault of his wife and his wife's sister. On appeal, he contends: (1) the circuit court erroneously admitted a police officer's opinion on the nature of his wife's wounds, (2) the evidence was insufficient, so his judgment of acquittal motions should have been granted, and (3) the court's judgment of conviction violated his rights because it included a notation that the aggravated assault of his wife constituted domestic abuse, when the jury made no such finding. We conclude that the officer's testimony about the wounds was not prejudicial; that the evidence was sufficient; and that adding the domestic abuse notation was error, but the remedy is to remand for entry of an amended judgment without the notation. Thus, we affirm and remand.

## Background

[¶2.]     On Easter Sunday, April 16, 2017, Tasina Swimmer attended a family picnic at a park in Sioux Falls with her mother, sisters, and other family members. Tasina's husband of three days, Nathan Scott, did not attend. After Tasina left the picnic early, some of her family members became concerned when they received disquieting text messages from Scott. They headed over to Tasina and Scott's apartment.

[¶3.]     Tasina's sister, Marissa Swimmer, and Marissa's husband, Oliver Red Feather, arrived first. They noticed Scott's vehicle double parked outside with the engine running. Oliver dropped Marissa off and continued down the street to park. As Marissa approached the apartment, she heard Tasina scream, "Help me." Marissa later testified that the scream was "just horrible, a horrible scream."

-1-

Finding the front door locked, Marissa threw her shoulder into the door and, in her words, "bursted it open." Once inside, Marissa saw her bloodied sister on the living room floor with Scott standing over her. He held a drywall hammer in his right hand, raised above his head as if he were about to strike Tasina. Marissa shouted, "Call the cops," to family members just arriving outside. Without saying anything, Scott left the apartment.

[¶4.] Marissa ran to Scott's car and removed the keys to prevent him from leaving. He left on foot, heading down the sidewalk, still holding the hammer. Marissa went back to the apartment to care for Tasina and await the police and an ambulance, while Tasina's sister, Sonia Bisonnette, pursued Scott. Sonia did not want Scott to escape. He told her to get away from him. She ignored him.

[¶5.] During the pursuit, Scott swung the hammer at her legs, but she jumped back to avoid being hit. When Scott darted across a yard and into an alley, Sonia followed. At one point, Scott turned back toward Sonia, yelling for her to leave him alone. Scott pushed her down with one hand while holding the hammer in the other. She stood up and pushed him. Scott again swung the hammer at her and the two struggled. He threw her down into a water puddle and landed on top of her. He raised the hammer above his head. She believed he was going to strike her with it. At that moment, Sonia's husband, Oliver, yelled from a distance, "[P]ut the hammer down, bitch." Both Scott and Sonia got up. He again swung the hammer at her legs but did not make contact. Then he ran away. Sonia told Oliver to follow him, and Sonia returned to Tasina. Oliver trailed Scott until he saw officers arrest

him at a nearby park. When he was arrested, Scott did not have the hammer, but it was later recovered nearby.

[¶6.] At Tasina's apartment, Officer Kylie Huemoeller took pictures of Tasina's injuries and the crime scene. Tasina's cheeks and lips were swollen, blood spurted from her nostrils when she breathed, there was blood around her mouth and she was spitting out blood, her knuckles were scratched, she had scrapes and bruises on her legs, and her clothing was ripped and disheveled. There were fresh blood spatters on the carpet and on a mattress in the living area. Officer Huemoeller was not able to interview Tasina at the apartment because she was "very emotional" and was "crying very hard." When Sonia returned, she was interviewed and her injuries were photographed. Later, at the hospital, Tasina allowed Officer Huemoeller to photograph some of her injuries, but she would not cooperate in filling out a victim's form. DNA samples taken from the hammer later tested positive for the presence of Tasina's and Scott's DNA.

[¶7.] A Minnehaha County grand jury indicted Scott on six counts: two counts of aggravated assault with a dangerous weapon, two counts of aggravated assault by physical menace, and two counts of simple assault. The indictment noted that the aggravated assaults of Tasina were "domestic" offenses as defined in SDCL 25-10-1. After a two-day trial, the jury found Scott guilty of two counts of aggravated assault by physical menace (one for Tasina and the other for Sonia). He was acquitted on the two counts of aggravated assault with a dangerous weapon. On the two misdemeanor simple assault counts, the jury found Scott guilty of one and not guilty on the other. Scott later admitted to an amended part II habitual

offender information. At sentencing, the court imposed twenty years in prison with five years suspended for the aggravated assault of Tasina, and fifteen years with ten suspended for the aggravated assault of Sonia. The sentences were set to run consecutively. Scott's conviction for simple assault was dismissed.

[¶8.]     Scott appeals on grounds that (1) the circuit court abused its discretion in admitting opinion evidence from a police officer, (2) there was insufficient evidence to support either conviction for aggravated assault by physical menace, and (3) he was entitled to have a jury determine whether he committed a domestic abuse offense as noted in the judgment of conviction.

## Analysis and Decision

### 1. Police officer's opinion on offensive and defensive wounds.

[¶9.]     In the following exchange, defense counsel asked Officer Huemoeller to relate her "training and experience about individuals who end up with scratch marks on their hands[.]"

> **Officer Huemoeller:** It can be either defense wounds or it can be from causing injuries themselves.
>
> **Defense Counsel:** How would one end up with injuries on their hands from causing injuries to themselves?
>
> **Officer Huemoeller:** If they were to strike someone, they could cause bruising or scratching to their knuckles.
>
> **Defense Counsel:** So the scratches and bruising to her hands could be defensive or offensive wounds?
>
> **Officer Huemoeller:** Yes.

On redirect examination, counsel for the State enquired:

> **State:** Would you please describe to me what you - - how you would describe defensive wounds?
>
> **Officer Huemoeller:** Typically when somebody's being hit in the face, they will block their hands to try to protect their face,

-4-

> whether they're doing it this way (indicating) or this way (indicating).
>
> **State:** And they sometimes get injuries to their hands trying to defend themselves?
>
> **Officer Huemoeller:** Yes.
>
> **State:** And offensive injuries, please describe what you know in your experience about those.
>
> **Officer Huemoeller:** If someone were to punch something, usually they get bruising or scratch marks along the knuckles. Depending on how flat they hit, they can get them on the knuckles and the fingers as well.
>
> **State:** Does the skin sometimes split on the knuckles from - -
>
> **Officer Huemoeller:** Yes.
>
> **State:** - - punching or hitting?
>
> **Officer Huemoeller:** Sometimes.
>
> **State:** *Did you see any split skin on Ms. Swimmer, Tasina Swimmer, that appeared to be offensive?*
>
> **Officer Huemoeller:** *No.*

(Emphasis added.) Defense counsel objected to the last question on foundational grounds. The court overruled the objection. On recross-examination, defense counsel asked Officer Huemoeller whether the scratches and bruises on Tasina's knuckles were "where it would be an offensive wound?" Officer Huemoeller replied, "Could be."

[¶10.]     In Scott's view, Officer Huemoeller's opinion testimony went beyond the range of an average person's experience; therefore, the State was required to establish that the officer was medically or scientifically qualified to give such an opinion. Allowing this testimony was prejudicial, he contends, because it "went to the issue of who may have been the aggressor"—Scott or Tasina. By allowing this opinion, Scott argues, "the trial court's actions incited . . . the jury to speculate regarding the opinion that an offensive injury was absent[.]" After all, no one

testified about what had happened inside the apartment *before* Tasina's sisters arrived.

[¶11.] We review a circuit court's evidentiary rulings for abuse of discretion. *State v. Buchholtz*, 2013 S.D. 96, ¶ 11 n.1., 841 N.W.2d 449, 454 n.1. SDCL chapter 19-19 governs the admission of opinion testimony. Expert opinion requires an adequate foundation based on that witness's "knowledge, skill, experience, training, or education[.]" SDCL 19-19-702. A lay opinion, on the other hand, is "based on the perception of the witness to an event, not the education or experience the witness possesses prior to the event." *State v. Condon*, 2007 S.D. 124, ¶ 29, 742 N.W.2d 861, 870. A lay "opinion is limited to one that is: (a) Rationally based on the witness's perception; (b) Helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) Not based on scientific, technical, or other specialized knowledge within the scope of § 19-19-702." SDCL 19-19-701.

[¶12.] Judges do not abuse their discretion in allowing counsel on redirect examination to clarify an issue opened up by opposing counsel on cross-examination, even if this evidence might otherwise be inadmissible. *United States v. Womochil*, 778 F.2d 1311, 1315 (8th Cir. 1985). Perhaps this precept is what the circuit court had in mind in allowing the officer to give her opinion. Yet, in its appellate brief, the State does not contend that defense counsel's questions opened the door to this line of inquiry. Rather, the State believes that all the officer's answers were based on her lay perception of what she observed. While Officer Huemoeller's testimony largely centered on her observations of Tasina's injuries and knowledge of offensive and defensive hand wounds in general, we cannot say

the same for the officer's specific opinion that Tasina's hand wounds did not appear to be offensive in nature.

[¶13.] "Offensive wounds" and "defensive wounds" are terms of art developed in forensics to describe injuries incurred by persons either acting as aggressors or acting to protect themselves. *State v. Wanatee*, 2018 WL 4922976, No. 17-0680, *5 (Iowa Ct. App). Pathologists and other medical experts are qualified to render opinions on the offensive or defensive nature of wounds; police officers do not ordinarily give such opinion testimony. *Floyd v. State*, 569 So. 2d 1225, 1232 (Fla. 1990) (medical examiner); *State v. Crawford*, 472 S.E.2d 920 (N.C. 1996) (medical examiner); *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001) (coroner). In at least one case, however, an officer was permitted to give an opinion "that the victim's wounds were consistent with 'defensive' ones, a conclusion that is beyond the ken of the average layman." *Caldwell v. State*, 538 S.E.2d 531, 534 (Ga. Ct. App. 2000). But in that case the officer was a paramedic who had received training on trauma, suicidal behavior, and determining whether wounds were self-inflicted. No comparable credentials were offered here.

[¶14.] In any event, who may be qualified to give this type of opinion testimony must be decided on a case-by-case basis, but here we need not reach the question whether Officer Huemoeller, without foundation, could properly have expressed an opinion on the defensive or offensive nature of Tasina's wounds. For several reasons, we conclude that Scott cannot show that he was prejudiced by this testimony.

[¶15.] Evidentiary rulings will not be overturned unless a defendant suffered material prejudice as a result. *State v. Reay*, 2009 S.D. 10, ¶ 39, 762 N.W.2d 356, 368. "Material prejudice is established 'when in all probability . . . it produced some effect upon the final result and affected the rights of the party assigning it.'" *Id.* (quoting *State v. Krebs*, 2006 S.D. 43, ¶ 19, 714 N.W.2d 91, 98). To begin with, Officer Huemoeller's opinion was equivocal on whether the nature of the wounds on Tasina's hands were offensive or defensive. At one point, the officer said they were defensive, but on recross-examination she conceded the wounds "[c]ould be" where offensive wounds are located.

[¶16.] Moreover, during trial there was no claim—much less any evidence— that Scott was defending himself, such that Tasina might have incurred offensive wounds to her hands. Defense counsel, in her opening statement, told the jury that Scott "snapped" and "started slapping [Tasina] around." "She has injuries as a result of him slapping her," counsel said, "We're not denying that." These same admissions were repeated in defense counsel's closing argument. In a recorded jailhouse phone call played for the jury, Scott, expressing his regret, can be heard telling Tasina, "I was just out of control. Just drinking, jealousy, anger." With his aggression unchallenged at trial, the claim now that the issue was "who may have been the aggressor" contradicts an uncontradicted record. What was contested throughout the trial was not whether he assaulted his wife, but whether he also assaulted her with a drywall hammer. Thus, whether Tasina incurred offensive wounds to her hands appears wholly irrelevant and nonprejudicial to any issue presented at trial.

## 2. Fear of imminent serious bodily harm.

[¶17.]     Scott next alleges error in the denial of judgments of acquittal on both counts of aggravated assault by physical menace.  As to the count concerning Sonia, he argues the State presented no evidence that Sonia was ever in fear.  He emphasizes that Sonia pursued him as he continued to try to walk away and that he repeatedly told Sonia to leave him alone.  According to Scott, the evidence of his attempt to flee proves he lacked the requisite intent to place Sonia in fear.  On the count related to Tasina, Scott argues that the State did not present any evidence that Tasina was ever in fear because she did not testify.

[¶18.]     We review the denial of a motion for a judgment of acquittal de novo. *State v. Tofani*, 2006 S.D. 63, ¶ 24, 719 N.W.2d 391, 398.  We "accept [the] evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *State v. Hemminger*, 2017 S.D. 77, ¶ 40, 904 N.W.2d 746, 759 (quoting *State v. Bucholz*, 1999 S.D. 110, ¶ 33, 598 N.W.2d 899, 905).  "If the evidence, including the circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt[,]" we will not set aside the verdict.  *State v. Beck*, 2010 S.D. 52, ¶ 7, 785 N.W.2d 288 (quoting *State v. Carter*, 2009 S.D. 65, ¶ 44, 771 N.W.2d 329, 342).

[¶19.]     To establish the crime of aggravated assault by physical menace, the State was required to prove: (1) an attempt by Scott to put another in fear of imminent serious bodily harm, (2) by means of physical menace, and (3) with a deadly weapon.  *See* SDCL 22-18-1.1(5).  Physical menace "requires more than words: there must be some physical act on the part of the defendant." *In re R.L.G.*,

2005 S.D. 119, ¶ 10, 707 N.W.2d 258, 261. However, the State need not prove "actual fear of imminent serious bodily harm." *State v. LaCroix*, 423 N.W.2d 169, 170 (S.D. 1988). Rather, an attempt to put another in fear exists when the defendant does "any act toward the commission of the crime but fails or is prevented or intercepted in the perpetration thereof." *R.L.G.*, 2005 S.D. 119, ¶ 9, 707 N.W.2d at 261 (quoting *State v. Schmiedt*, 525 N.W.2d 253, 255 (S.D. 1994)).

[¶20.]     From our review of the record, there was sufficient evidence for the jury to find that Scott used the hammer (a deadly weapon) to attempt to place Sonia in fear of imminent serious bodily harm. Sonia testified that Scott pushed her down to the ground and then raised the hammer above her. Although not necessary to prove the offense, she believed he was going to strike her with the hammer. Oliver similarly testified that when he caught up to Scott and Sonia, he observed Scott standing above Sonia with the hammer raised in the air. Both Oliver and Sonia testified that Oliver's yelling interrupted Scott from actually striking her. This evidence, if believed by the jury, was sufficient to sustain Scott's conviction of aggravated assault by physical menace against Sonia.

[¶21.]     Likewise, the State presented sufficient evidence for the jury to find beyond a reasonable doubt that Scott used the hammer to place Tasina in fear of imminent serious bodily harm. Marissa testified that she heard "horrible" screams for help from Tasina outside the apartment. Marissa then found Tasina, bloody and crying, on the apartment floor. Scott was standing over her with the hammer in his hand raised in the air appearing as though he was about to strike her. While Tasina did not testify, the evidence, if believed by the jury along with reasonable

inferences drawn therefrom, supports Scott's conviction of aggravated assault by physical menace.

### 3. Domestic abuse notation.

[¶22.] Lastly, Scott avers violations of due process and jury trial rights because the circuit court noted in the judgment and sentence, without a specific finding by the jury, that his conviction for aggravated assault of Tasina was "domestic," meaning it was a conviction involving domestic abuse. At issue here is whether Scott had a constitutional right to have the jury determine whether his offense was "domestic abuse" because a "domestic" notation subjects a defendant to "costs" under SDCL 25-10-17.1, which he contends amounts to "a penal (punitive) and not a civil fine[.]" We review de novo claimed infringements of constitutional rights. *State v. Tiegen*, 2008 S.D. 6, ¶ 14, 744 N.W.2d 578, 585.

[¶23.] Our Legislature mandates that state's attorneys "indicate on the summons, complaint, information, indictment, arrest warrant, and judgment of conviction whether the charge involves domestic abuse." SDCL 25-10-34. And, under SDCL 25-10-17.1, "the court shall order any person convicted of a crime involving domestic violence or domestic abuse to remit costs in the amount of twenty-five dollars to the clerk of courts." *Id.* This cost is "[i]n addition to any other penalty, assessment, or fine provided by law[.]" *Id.* The United States Supreme Court makes clear that its "decisions broadly prohibit judicial fact finding that increases maximum criminal 'sentence[s],' 'penalties,' or 'punishment[s]'[.]" *S. Union v. United States*, 567 U.S. 343, 350, 132 S. Ct. 2344, 2351, 183 L. Ed. 2d 318 (2012). These terms, the Supreme Court remarked, "each undeniably embrace

fines." *Id.* (citing *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)).

[¶24.]     No fine is imposed by SDCL 25-10-17.1, so the question is whether this "cost" is constitutionally equivalent to a fine.  But this question must remain undecided here; the circuit court did not impose the mandatory twenty-five dollar cost.  The judgment of conviction only directs Scott to remit the standard $104 in "court costs" for the aggravated assault of Tasina and the same costs for the non-domestic abuse conviction of aggravated assault of Sonia.  And the court's oral pronouncement of sentence did not impose the twenty-five dollar domestic abuse cost under SDCL 25-10-17.1.  Under South Dakota law, where any ambiguity exists, "the oral sentence controls." *State v. Thayer*, 2006 S.D. 40, ¶ 7, 713 N.W.2d 608, 611.

[¶25.]     Nonetheless, Scott contends that he is entitled to a new trial for a "jury finding regarding a domestic offense occurring." *See* SDCL 25-10-34.  Yet Scott does not argue that an essential element of his conviction for aggravated assault requires a finding of domestic abuse.  Indeed, in *State v. Outka*, we held that the domestic abuse notation made under SDCL 25-10-34 does not change the nature of the crime. 2014 S.D. 11, ¶ 15, 844 N.W.2d 598, 604.  So the "domestic" notation in Scott's judgment and sentence did not alter his conviction for aggravated assault.  Nor did it change the punishment he received.  Therefore, the jury's verdict is sufficient to support the judgment of conviction.

[¶26.]      Finally, Scott argues that his aggravated assault conviction pertaining to Tasina must be reversed for a new trial because the judgment and sentence with the "domestic" notation did not correspond to the jury's verdict, as the verdict made no finding on that issue.  SDCL 23A-27-4 requires that "the judgment of conviction . . . set forth . . . the verdict or findings, and the adjudication and sentence."  Indeed, the circuit court did not ask the jury to decide whether the charge constituted domestic abuse.  Consequently, the judgment of conviction should not have included the "domestic" notation.  But because Scott's aggravated assault conviction stands independent from any supplemental finding of domestic abuse, the remedy here is not to reverse the conviction but only to remand with instructions to enter an amended judgment without the "domestic" notation.

[¶27.]      Affirmed and remanded in accordance with this opinion.

[¶28.]      GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.