#29878-aff in pt & rev in pt-PJD
**2023 S.D. 15**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

v.

JAY JOSEPH PENEAUX,                          Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE CRAIG A. PFEIFLE
Judge

\* \* \* \*

TODD A. LOVE
Rapid City, South Dakota                          Attorney for defendant
                                                  and appellant.


MARTY J. JACKLEY
Attorney General

JONATHAN K. VAN PATTEN
Assistant Attorney General
Pierre, South Dakota                          Attorneys for plaintiff
                                              and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
OCTOBER 3, 2022
OPINION FILED **03/15/23**

#29878

DEVANEY, Justice

[¶1.] Jay Peneaux was charged with multiple offenses relating to the assault of his ex-wife, Brittany, and his later efforts to get the pending charges dismissed. After the close of the State's evidence during a jury trial, Peneaux moved for a judgment of acquittal on all charges. The circuit court denied the motion, and the jury found Peneaux guilty on all counts. Peneaux appeals, arguing that there was insufficient evidence for the jury to find him guilty of aggravated assault and threatening and harassing conduct. We affirm in part, reverse in part, and vacate the conviction on the threatening and harassing conduct charge.

**Factual and Procedural Background**

[¶2.] Peneaux and Brittany began their relationship in 2006. At the time, Peneaux was 22 years old, and Brittany was 14 years old. Brittany became pregnant and gave birth to the couple's first child in 2007. They were married in 2014, and Brittany gave birth to two additional children, one in 2015 and one in 2018. Throughout their marriage, Brittany was subjected to emotional abuse from Peneaux. According to Brittany, this abuse was especially prevalent when Peneaux was drinking or getting high. In addition to emotional abuse, Brittany claimed Peneaux physically abused her multiple times throughout their marriage.

[¶3.] Evidence of prior acts of abuse was admitted at trial. One such act occurred during the summer of 2018 when, after a night of drinking at a bar, Peneaux pulled Brittany's hair, threw her on the ground, and jumped on top of her during an argument outside their home. She did not call the police, explaining that Peneaux provided the family's only source of income. In another incident in

December 2018, after an argument during which Brittany was attempting to get her car keys back from Peneaux, he started choking her and then threw her off the porch. This time Brittany did call the police.

[¶4.] Trial testimony was also presented regarding an incident occurring in November 2019. During this incident, Peneaux grabbed a knife from the kitchen after arguing with Brittany and threatened to kill her and her family. Upon seeing their daughter, who was recording the incident, Peneaux turned the knife on himself and threatened suicide. He left the home when Brittany's mother arrived. Her mother called the police to report what had happened, and charges were filed relating to this incident. But after receiving numerous threatening text messages from Peneaux, Brittany complied with his instructions and wrote a letter to the judge handling the case asking that the charges be dismissed. Brittany testified that during each of the above altercations, she believed Peneaux to be intoxicated from either drugs or alcohol.

[¶5.] In late 2019, Brittany decided to initiate divorce proceedings, and the divorce was finalized approximately one year later. After the divorce, Peneaux was living with his parents, but in April 2021, Brittany allowed him to stay at her home. Peneaux had informed Brittany that he had a job lined up and that he was trying to work on his sobriety. He explained that it was difficult for him to stay sober at his parents' home. According to Brittany, although they no longer had a romantic relationship, she allowed Peneaux to stay at her home in the hope that he would stay sober and reconnect with their children. Peneaux slept in the children's room

while staying in her home. She was aware that Peneaux had a girlfriend named Janelle Fisher who was in jail at the time.

[¶6.] On April 27, 2021, Peneaux informed Brittany that he would be leaving indefinitely to work at a construction site out of town. He also mentioned that Janelle had gotten out of jail, and he was going to go see her before leaving town. Peneaux left Brittany's home, and when he returned, Brittany thought he appeared to be high because he was acting aggressive and talking about things that did not make sense. This behavior upset Brittany, and they then had an argument about Peneaux's role as a father. The argument ended when Peneaux asked for Brittany's keys, so he could collect his things from her vehicle. Once he collected his belongings, he left Brittany's keys on the driver's seat of her vehicle and got into his own vehicle and sped off.

[¶7.] Shortly after Peneaux left, Brittany went to retrieve her keys from her vehicle. While doing so, she noticed that the glove compartment and center console were left open. She then discovered that Peneaux had taken money from the center console and her handgun from the glove compartment. Brittany kept the magazine for the handgun at the bottom of the center console, and it was still there.

[¶8.] Later that same evening, Brittany drove to the trailer home owned by Peneaux's parents to retrieve the gun from him. When Brittany confronted Peneaux, they argued about the gun and about how his behavior affected their children. Peneaux refused to give the gun back. According to Brittany, he was yelling loudly, he shoved her, and she shoved him back. He also threw a beer in her face. Peneaux told her to leave the property immediately and mentioned that his

brother Heath who was at his parents' home, was "wanted." Brittany then left and went home to put her kids to bed.

[¶9.] Brittany explained that later that night, she could not go to sleep because she was upset about Peneaux's actions and with herself for letting him back into their children's lives. She also felt unsafe and wanted her gun back. She was afraid, given her perception of Peneaux being high, that he might pawn her gun like he had done with other possessions when their marriage ended. Accordingly, in the early morning hours of April 28, 2021 (around 2:00 a.m.), Brittany returned to the trailer home to retrieve her gun.

[¶10.] The events that occurred in front of Peneaux's parents' home during this second visit were captured on a neighbor's security camera. The silent video footage shows Brittany getting out of her car and walking toward the front of the trailer home. Unbeknownst to Brittany, Peneaux was sitting in his pickup truck, which was parked on the backside of the home in an area that cannot be seen on the video. According to Brittany, once Peneaux noticed her, he got out of his truck and confronted her. He was very angry and began yelling at her because she had come back despite him previously telling her to leave the property. While he was yelling at her, Brittany could see someone who looked like his girlfriend, Janelle, in the driver's seat of Peneaux's truck.

[¶11.] Thereafter, things escalated. Brittany claimed that Peneaux grabbed her gun from his truck and asked her if this was the gun she wanted. She stated that he then threatened to "take [her] out and [her] family" so she "just ran." The video footage shows Brittany running back to the front of the home and getting

-4-

inside her vehicle. It also shows Peneaux running around the opposite side of the garage to the front of the home and approaching Brittany's vehicle. The video shows him punching the passenger-side windows. Brittany then gets out of the vehicle and walks toward the front of her car where Peneaux confronts her and physically takes her to the ground.

[¶12.] It is very difficult to discern on the video what is occurring while they are on the ground. According to Brittany, while Peneaux had her pinned to the ground, he grabbed the gun from his waistband and asked her if she wanted to end up like her brother who had passed away just a month prior. In an effort to get away, Brittany bit Peneaux, grabbed the gun, and tried to pull it away from him. She claims that he then punched her on the side of her head and called for his brother, Heath, who can be seen on the video walking over to Peneaux and Brittany while they are on the ground wrestling. The video shows Heath lean down toward Brittany and Peneaux and remove the gun as they continue to wrestle. It is not clear from the video whether the gun was handed to Heath or whether he pulled it away from them. However, the video shows Heath walking away, after which Peneaux draws his arm back and punches Brittany two more times. Brittany testified that she blacked out at this point.

[¶13.] Directly after striking Brittany, Peneaux can be seen getting up and walking away. A few seconds later, the video shows Brittany get up and walk toward Peneaux and other members of his family who were standing nearby watching the altercation occur. At trial, Brittany explained that Peneaux's family members told her to leave because they did not want the police to come. Brittany

could not find her keys and the video shows her looking for them in the area surrounding her vehicle and in the driveway. Brittany later discovered her keys in the pocket of the sweatshirt she was wearing under her coat.

[¶14.]     A neighbor witnessed the altercation and called 911. Shortly thereafter, law enforcement arrived at the scene and found Brittany sitting outside on the curb crying. Officers observed swelling, redness, and blood on Brittany's face. They also noticed that her nose appeared to be deformed. After the officers spoke with Brittany about what had happened, a paramedic with the fire department evaluated Brittany at the scene. The paramedic observed bruising across the bridge of her nose but could not ascertain if it was broken. After this assessment, the paramedic determined that she did not need emergency care.[1]

[¶15.]     Although the officers attempted to apprehend Peneaux, they were unsuccessful due to their inability to enter the trailer home. After knocking and receiving no answer, law enforcement discovered that the entrances had been barricaded. Given the concern that Peneaux might be inside with a gun, along with his brother who had outstanding warrants, the officers elected not to attempt a forced entry at that time.

[¶16.]     Later that morning, an arrest warrant for Peneaux was issued. When law enforcement executed a search warrant on the home to arrest Peneaux and

---

1.     Photographs taken by law enforcement at the scene and later at the police department depicted bruising on Brittany's body and around both of her eyes. She testified at trial that after the assault, she experienced headaches and confusion. However, she explained that she did not go to a doctor for follow-up care, as suggested, because she does not have health insurance.

locate the gun, no one was inside. They did not locate Brittany's gun during the search; however, Peneaux's mother later brought the gun to the police department.

[¶17.] On May 2, 2021, Peneaux contacted Brittany via telephone twice. In the first call, he told her to drop the charges or he would hurt her and her family. In the second call, he said, "Watch this[,]" which Brittany perceived as a threat. Peneaux was subsequently arrested on May 4, 2021, after Peneaux's mother allowed law enforcement to enter the Peneaux home to search for him. While searching, officers found Peneaux hiding inside a zippered mattress. As a condition of the bond set after he was arrested, Peneaux was ordered to have no contact with Brittany.

[¶18.] On May 20, 2021, an information was filed containing two counts of aggravated assault for the events that occurred on April 28, 2021, one charging Peneaux with a violation of SDCL 22-18-1.1(1) (extreme indifference to human life) and the other charging a violation of SDCL 22-18-1.1(5) (physical menace with a deadly weapon). The information also contained charges of witness tampering in violation of SDCL 22-11-19 and threatening or harassing conduct in violation of SDCL 49-31-31(1) based on statements Peneaux made to Brittany during the May 2 phone calls. On August 11, 2021, a grand jury issued an indictment charging Peneaux with the same four offenses. The indictment contained an additional charge of felony stalking in violation of SDCL 22-19A-1(3) and SDCL 22-19A-2

based on texts Peneaux sent to Brittany on June 30, 2021, while the order prohibiting contact was in place.[2]

[¶19.]       On November 1, 2021, a three-day jury trial commenced. In addition to the video of the assault and Brittany's testimony detailing the above-described events, the State called several other witnesses, including law enforcement officers; Brittany's mother, who testified about past abuse; and Brittany and Peneaux's daughter, who witnessed Peneaux take something out of the console of Brittany's car when he left Brittany's home on April 27. At the close of the State's evidence, Peneaux moved for a judgment of acquittal on all counts. As to the first aggravated assault charge, he argued that the State did not present evidence that Brittany suffered serious bodily injury. As to the second aggravated assault charge, he offered arguments similar to those he now makes on appeal with respect to the element regarding the use of a deadly weapon. He argued that this element could not be met because Brittany knew the gun was unloaded. Peneaux did not present any argument with respect to the threatening and harassing contact charge at issue in this appeal. The circuit court denied Peneaux's motion as to all counts except for the second aggravated assault charge, which the court took under advisement.

---

2.     Peneaux was later indicted via a superseding indictment issued on September 15, 2021, charging, in addition to the existing five counts, one count of solicitation of perjury in violation of SDCL 22-4A-1, SDCL 22-29-1 and SDCL 22-29-5(2) and one count of solicitation to be an accessory after the fact in violation of SDCL 22-4A-1, SDCL 22-3-5, and SDCL 22-3-3.1. These solicitation charges stemmed from a July 8, 2021 phone call between Peneaux and his mother in which he asked her to testify that she was the one sending some of the text messages underlying the pending stalking charge. On Peneaux's motion, the solicitation to be an accessory charge was dismissed prior to trial. The remaining solicitation charge is not at issue in this appeal.

[¶20.] In his defense, Peneaux called several witnesses, including multiple family members who were at the home during the incident and his girlfriend, Janelle, who was with Peneaux in his truck when Brittany came back the second time. According to the defense witnesses, Brittany was the one who brought the gun to confront Peneaux at his parents' home. Janelle testified that Brittany began hitting the windows of Peneaux's pickup with the gun shortly after arriving. She claimed that Peneaux ran after Brittany in order to disarm her. According to Janelle, Peneaux was not the aggressor and he never threatened Brittany. Janelle also testified about screenshots of text messages Brittany purportedly sent to Peneaux earlier that evening expressing that she hated him and that she wanted to die because she wanted him and her family back.

[¶21.] Through cross-examination of Brittany and the law enforcement officers who had interviewed her, Peneaux pointed out multiple inconsistencies in Brittany's initial story regarding the events surrounding the assault. In particular, Brittany initially told law enforcement that she and Peneaux were in her vehicle outside the Peneaux home when the argument started and that this is when he took the gun from her car before attacking her. Brittany admitted in a later interview, and at trial, that she had initially lied about when Peneaux took the gun because she was ashamed and did not want anyone to know that she had let him back into her life and let him stay in her home.

[¶22.] Prior to the defense resting, the circuit court denied Peneaux's motion for a judgment of acquittal on the charge of aggravated assault by physical menace with a deadly weapon. The court concluded that there was sufficient evidence from

Brittany's testimony to establish the necessary element pertaining to the use of a deadly weapon. The case was submitted to the jury, and after an overnight recess, the jury returned a verdict on the afternoon of the second day of deliberation. The jury found Peneaux guilty on all six counts.

[¶23.] Peneaux timely appealed, and his issues are restated as follows:

1. Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(1).

2. Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(5).

3. Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of threatening or harassing contact in violation of SDCL 49-31-31(1).

**Standard of Review**

[¶24.] "This Court reviews 'a denial of a motion for judgment of acquittal de novo.'" *State v. Timmons*, 2022 S.D. 28, ¶ 14, 974 N.W.2d 881, 887 (quoting *State v. Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d 62, 68). "[A] motion for a judgment of acquittal attacks the sufficiency of the evidence[.]" *Id.* (alterations in original) (quoting *State v. Wolf*, 2020 S.D. 15, ¶ 12, 941 N.W.2d 216, 220). "In measuring the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Frias*, 2021 S.D. 26, ¶ 21, 959 N.W.2d at 68 (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). "[T]he jury is the exclusive judge of the credibility of the witnesses and the weight of the evidence[,]" and "this Court will not resolve conflicts in the evidence,

pass on the credibility of witnesses, or weigh the evidence." *Id.* (first alteration in original) (quoting *State v. Bausch*, 2017 S.D. 1, ¶ 33, 889 N.W.2d 404, 413).

## Analysis and Decision

> **1.   Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(1).**

[¶25.]     Peneaux argues that his conviction for aggravated assault under SDCL 22-18-1.1(1) is not supported by sufficient evidence because his conduct did not rise to the level required for a finding of "circumstances manifesting extreme indifference to the value of human life."[3]  He highlights the video evidence showing that he walked away directly after punching Brittany.  He also claims that unlike the scenarios presented in other aggravated assault cases considered by this Court, no one had to interfere to stop the altercation.  The State responds that Peneaux's act of dragging Brittany to the ground and delivering multiple punches to her head, coupled with his threatening statements to her while holding a deadly weapon, are sufficient to sustain the conviction.

[¶26.]     "Our Legislature has not declared what circumstances constitute extreme indifference to the value of human life under SDCL 22-18-1.1(1)." *Wolf*, 2020 S.D. 15, ¶ 15, 941 N.W.2d at 221.  "However, it has 'deemed significant the nature of the assaultive act or acts themselves.'" *Id.* (quoting *State v. Miland*, 2014 S.D. 98, ¶ 18, 858 N.W.2d 328, 332).  We have sustained a finding of guilt under

---

3.     The full text of the subsection relating to this type of aggravated assault provides that any individual who "[a]ttempts to cause serious bodily injury to another . . . under circumstances manifesting extreme indifference to the value of human life . . . is guilty of aggravated assault." SDCL 22-18-1.1(1).

SDCL 22-18-1.1(1) when "the accused's 'conduct was of the most threatening sort,' such that the circumstances 'demonstrate a blatant disregard for the risk to the victim's life, and the accused either attempted to or did cause serious bodily injury[.]'" *Miland*, 2014 S.D. 98, ¶ 18, 858 N.W.2d at 332–33 (quoting *State v. Saucier*, 512 A.2d 1120, 1125 (N.H. 1986)). "The severity of the resulting injuries and the accused's state of mind may be germane to the extreme indifference question, but the main focus is on the *conduct* of the accused." *Id.* ¶ 18, 858 N.W.2d at 332.

[¶27.] Although Peneaux attempts to distinguish the facts in his case from other aggravated assault cases considered by this Court, "these distinctions simply mark differences in the factual records—not a definitive line that categorically prevents a finding of extreme indifference where an attack abates." *Wolf*, 2020 S.D. 15, ¶ 18, 941 N.W.2d at 221. Therefore, the unique facts of each case must be evaluated on their own merits. Nevertheless, we note some similarities between the facts here and in prior cases cited by Peneaux.

[¶28.] In *State v. White Mountain*, 477 N.W.2d 36, 39 (S.D. 1991), for example, this Court upheld an aggravated assault conviction under SDCL 22-18-1.1(1) involving circumstances analogous to those here, where the defendant repeatedly kicked the victim in the head and stomach while she was defenseless on the ground. During this attack, the defendant asked the victim if she wanted to die and then told her that she was going to die. *Id.* at 37. The Court found this evidence sufficient to support the jury's finding that the defendant attempted to

cause serious bodily injury in circumstances demonstrating extreme indifference to the value of human life. *Id.* at 39.

[¶29.] Also, in *Miland*, we considered whether a defendant demonstrated extreme indifference to the value of human life when, during a routine traffic stop, he began to punch a police officer multiple times in the face. 2014 S.D. 98, ¶ 4, 858 N.W.2d at 329–30. The defendant continued this beating until he was eventually pulled away by another officer. In affirming the conviction, the Court noted that had the other officer not intervened, the defendant would have most certainly continued the assault. *Id.* ¶ 20, 858 N.W.2d at 333.

[¶30.] More recently, the Court affirmed a conviction under SDCL 22-18-1.1(1) in *Wolf*, a case in which the defendant, an inmate at the South Dakota State Penitentiary, attacked a corrections officer by kicking and kneeing him in the face and head for approximately 20 seconds. 2020 S.D. 15, ¶ 3, 941 N.W.2d at 218. The defendant then put the officer in a chokehold, limiting the officer's ability to breathe "for a few seconds." *Id.* ¶ 4. Although the officer was able to escape the chokehold and spray the defendant with "OC spray," the Court reasoned that the defendant would have continued the assault but for the defensive maneuvers made by the officer after he was attacked. *Id.* ¶¶ 4, 19, 941 N.W.2d at 219, 221–22.

[¶31.] Here, the video shows Brittany running toward her vehicle and Peneaux also running, via a different route, toward the driveway where Brittany's vehicle was parked. After she took refuge inside her vehicle, Peneaux began punching its windows. An altercation then ensued outside the vehicle, where Peneaux pinned Brittany to the ground. Brittany testified that while Peneaux had

her on the ground, he made threatening comments about "taking out" her and her family. He also referred to Brittany "ending up like" her brother who had recently passed away. According to Brittany, these threatening remarks were made while Peneaux was holding Brittany's gun.

[¶32.]     In an attempt to defend herself, Brittany bit Peneaux and tried to wrestle the gun away from him while they were on the ground. These efforts appeared, from what the video shows, to have hindered Peneaux, at least temporarily, from acting on his threats. Although the testimony at trial indicates that Heath's intervention here was at the behest of Peneaux, what transpired after Heath removed the gun from the scenario is equally troubling. Once Heath walked away with the gun, Brittany, who was still lying on the ground, appeared submissive. Peneaux nevertheless continued to assault her, punching her twice, with blows to her face and head, one of which likely broke her nose. According to Brittany, she briefly lost consciousness at this time.

[¶33.]     Although Peneaux offered a different version of the events to the jury, "[t]his Court examines the evidence in its totality and does not reweigh evidence or pass on the credibility of witnesses." *State v. Ahmed*, 2022 S.D. 20, ¶ 20, 973 N.W.2d 217, 223. When considering this evidence in a light most favorable to the verdict, it was reasonable for the jury to conclude that Peneaux demonstrated a blatant disregard for the risk to Brittany's life based upon his conduct during the attack. Additionally, by pinning Brittany to the ground and punching her at least twice in the head, it was reasonable for the jury to conclude that Peneaux attempted to cause Brittany serious bodily injury. *See Miland*, 2014 S.D. 98, ¶ 14,

858 N.W.2d at 332–33 (noting the risk of a life-long injury when there is a blow to the head). An attempt to cause serious bodily injury can, under circumstances such as those present here, demonstrate extreme indifference to the value of human life. Therefore, the circuit court did not err in denying Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(1).

### 2. Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(5).

[¶34.] Peneaux argues his conviction for aggravated assault under SDCL 22-18-1.1(5) is not supported by sufficient evidence because Brittany testified that she knew the gun was not loaded given that the magazine for the gun was still in the console of her vehicle at the time of the assault. He thus contends the gun could not have met the definition of a deadly weapon as required for a conviction under this particular statute.

[¶35.] The State responds that Brittany had lost control of the gun for several hours prior to the incident; therefore, she could not have known whether the gun was loaded.[4] The State argues this evidence was sufficient for the jury to reasonably conclude that Peneaux used a deadly weapon to put Brittany in fear of imminent serious bodily harm.

---

4. Aside from defense counsel's cross-examination of Brittany, there is no evidence in the record confirming whether, at the time of the events in question, the gun was in fact unloaded. Law enforcement did not locate the gun when searching the Peneaux home the morning after the assault, and it was Peneaux's mother who later brought it to law enforcement.

[¶36.] SDCL 22-18-1.1(5) provides that any individual who "[a]ttempts by physical menace with a deadly weapon to put another in fear of imminent serious bodily harm . . . is guilty of aggravated assault." *Id.* A "deadly weapon" is defined in SDCL 22-1-2(10) as "any firearm, stun gun, knife, or device, instrument, material, or substance, whether animate or inanimate, which is calculated or designed to inflict death or serious bodily harm, or by the manner in which it is used is likely to inflict death or serious bodily harm[.]"

[¶37.] We have explained that "[t]he gravamen of the offense is the attempt to put a person in fear of imminent serious bodily harm. Actual fear of imminent serious bodily harm is not an essential element of the offense." *Ahmed*, 2022 S.D. 20, ¶ 15, 973 N.W.2d at 221 (quoting *State v. LaCroix*, 423 N.W.2d 169, 170 (S.D. 1988)). We have further held that "[p]hysical menace 'requires more than words: there must be some physical act on the part of the defendant.'" *State v. Scott*, 2019 S.D. 25, ¶ 19, 927 N.W.2d 120, 127 (quoting *In re R.L.G.*, 2005 S.D. 119, ¶ 10, 707 N.W.2d 258, 261).

[¶38.] In support of his argument, Peneaux relies on an excerpt from *State v. Heumiller*, a case addressing the question whether an unloaded gun can be considered a deadly weapon under SDCL 22-18-1.1(5). 317 N.W.2d 126, 131 (S.D. 1982). In *Heumiller*, the Court viewed an alleged assault charge under SDCL 22-18-1.1(5) from the perspective of the victim and referred to the gravamen of the offense being "the fear it instills in the mind of the victim who ordinarily does not know whether the firearm is in fact loaded." *Id.* at 131. The Court further noted that absent "evidence that the victim knew the gun was unloaded, it is deemed

loaded for the purpose of proving the element of fear[.]" *Id. Heumiller* later states that "the gravaman [sic] of the offense is not whether the gun was in fact loaded, but whether the [gun] was used to put the victim in fear of imminent serious bodily injury." *Id.*

[¶39.]     Our cases subsequent to *Heumiller* have consistently held, and clarified, that "the State need not prove 'actual fear of imminent serious bodily harm.'" *Ahmed*, 2022 S.D. 20, ¶ 19, 973 N.W.2d at 222 (quoting *Scott*, 2019 S.D. 25, ¶ 19, 927 N.W.2d at 127).  Therefore, the statements in *Heumiller* suggesting that the victim's fear is an element of a crime charged under SDCL 22-18-1.1(5) are incorrect.  The relevant question is not whether the victim knew the gun was unloaded.  Instead, the focus is on what the defendant was *attempting* to do with the gun.

[¶40.]     Here, Brittany testified that Peneaux threatened her with the gun when he got out of the pickup, and after he later pinned her to the ground, he withdrew the gun from his waistband and asked her if she wanted to end up like her recently deceased brother,  In light of this testimony, there is sufficient evidence to support the jury's finding that Peneaux attempted to put Brittany in fear of imminent serious bodily harm.  Accordingly, the circuit court did not err in denying Peneaux's motion for judgment of acquittal on the charge of aggravated assault in violation of SDCL 22-18-1.1(5).

### 3. Whether the circuit court erred by not granting Peneaux's motion for judgment of acquittal on the charge of engaging in threatening or harassing contact in violation of SDCL 49-31-31(1).

[¶41.] Peneaux argues his conviction under SDCL 49-31-31(1) is not supported by sufficient evidence because the State did not put forth any evidence tending to prove that he used obscene or lewd language or that he suggested a lewd or lascivious act on May 2, 2021.[5]

[¶42.] As stated in SDCL 49-31-31(1): "It is a Class 1 misdemeanor for a person to use a telephone or other electronic communication device . . . [t]o contact another person with intent to terrorize, intimidate, threaten, harass, or annoy such person by using obscene or lewd language or by suggesting a lewd or lascivious act." Neither this Court nor the Legislature has defined "lewd or lascivious." *State v. Dubois*, 2008 S.D. 15, ¶ 35, 746 N.W.2d 197, 208. However, we have noted that "*Black's Law Dictionary* defines lewd as: '[o]bscene or indecent; tending to moral impurity or wantonness,' 926 (8th ed. 2004); *Black's Law Dictionary* defines lascivious as: '([o]f conduct) tending to excite lust; lewd; indecent; obscene.' 897 (8th ed. 2004)." *Id.*

---

5. Count 4 of the indictment charged the following:

> That on or about the 2nd day of May, 2021, in the County of Pennington, State of South Dakota, DEFENDANT JOSEPH PENEAUX did commit the public offense of THREATENING OR HARRASSING CONTACT in that he did then and there use a telephone or other electronic communication device to contact another person, to-wit: Brittany Peneaux, with intent to terrorize, intimidate, threaten, harass or annoy such person by using obscene or lewd language or by suggesting a lewd or lascivious act, in violation of SDCL 49-31-31(1).

[¶43.] In a case addressing the same argument Peneaux makes here, this Court rejected the defendant's allegations that his comments were not obscene or lewd. *See State v. Crelly*, 313 N.W.2d 455, 457 (S.D. 1981). While discussing what type of comments are considered to be "obscene," the Court noted that "we must take the normal everyday meaning of the word 'obscene', in other words: Lewd, impure, filthy, offensive to modesty or decency." *Id.* at 456 (quoting *Baker v. State*, 494 P.2d 68, 71 (A.Z. 1972)). The defendant in *Crelly* was found guilty pursuant to SDCL 49-31-31(1) after he called a prosecutrix a "no good fucking whore," a "sleazy slut," and "slut" during a phone conversation. *Id.* at 457. In affirming the circuit court's finding of guilt, the Court found this particular communication to be "patently offensive" and "the type of utterance that SDCL 49-31-31(1) was designed to prohibit." *Id.*

[¶44.] Here, the only evidence presented at trial regarding Peneaux's May 2, 2021 phone calls was Brittany's testimony. Brittany testified that Peneaux's first call came at 11:20 a.m. and lasted 13 seconds. When asked what happened during that 13-second phone call, Brittany testified as follows: "He just said that -- that I better drop the charges. Otherwise, he will hurt me and my family. And then he hung up." The second phone call came at 11:21 a.m. and lasted 2 seconds. Brittany testified that Peneaux stated, "watch this" and then hung up.

[¶45.] In response to Peneaux's arguments as to this issue, the State does not focus on what Peneaux said in the *May 2 phone calls*; rather, the State refers to the *texts* Peneaux sent to Brittany on June 30, 2021. Although these later texts contain language that could be described as obscene, lewd, or lascivious, these texts were

the subject of the felony stalking charge set forth in a different count in the indictment for which Peneaux was convicted and sentenced.[6]

[¶46.]	The May 2, 2021 statements made by Peneaux as charged in the count at issue cannot be described as obscene or lewd, nor can they be construed to suggest a lewd or lascivious act. Although threatening and intimidating, the comments made during these phone calls fall outside the "patently offensive" language SDCL 49-31-31(1) "was designed to prohibit." *See Crelly*, 313 N.W.2d at 457. Because there was insufficient evidence presented to the jury to support a finding of guilt regarding Count 4, the circuit court erred in denying Peneaux's motion for judgment of acquittal on the charge of engaging in threatening or harassing contact in violation of SDCL 49-31-31(1). Therefore, we vacate the Peneaux's conviction on Count 4.

[¶47.]	Affirmed in part and reversed and vacated in part.

[¶48.]	JENSEN, Chief Justice, and KERN and MYREN, Justices, concur.

---

6.	The dissent, in its application of the "invited error" doctrine, notes that during closing argument, Peneaux's counsel conceded that there was evidence to support Count 4. However, it is apparent that Peneaux's counsel, like the State in this appeal, was mistakenly referring to the texts sent on June 30, which prompted the additional charge against Peneaux in Count 5. In both quotes noted by the dissent, defense counsel referred to Peneaux's "sexual messages" and "sexual comments." But Count 4 concerned only the May 2 phone calls and those calls did not contain a reference to anything of a sexual nature. Moreover, when conceding that there was evidence to find Peneaux guilty on Count 4, defense counsel specifically referred to the "sexual comments." Counsel then asked the jury to find Peneaux *not guilty* on Count 5 (the felony charge which actually did pertain to the sexual comments). Thus, contrary to the dissent's suggestion, defense counsel's statements do not appear to be part of a calculated strategy or an affirmative act of sandbagging. Rather, it is apparent here that Peneaux's counsel simply mixed up the charges by associating the wrong evidence with the wrong counts.

[¶49.]        SALTER, Justice, concurs in part and dissents in part.


SALTER, Justice (concurring in part and dissenting in part).

[¶50.]        I would not review the merits of Peneaux's challenge to his

misdemeanor conviction for threatening or harassing conduct, as alleged in Count 4,

and I write to respectfully explain why.  I otherwise join the Court's opinion.

[¶51.]        A fundamental precept of appellate review posits that a party may not

ask a court to do something, only to later claim that granting the request was

erroneous.  The resulting rule is commonly referred to as the doctrine of invited

error, but some courts have described it more colloquially as an effort to avoid a

dubious litigation practice known as "sandbagging[.]"  *See Flowers v. State*, 149 So.

3d 1206, 1208 (Fla. Dist. Ct. App. 2014) (holding the doctrine of invited error is

designed to prevent "sandbagging").  Regardless of the moniker, the concept is an

eminently sensible one:

> The doctrine of "invited error" embodies the principle that a
> party will not be heard to complain on appeal of errors which he
> himself induced or provoked the court or the opposite party to
> commit.  It has been held that for the doctrine of invited error to
> apply it is sufficient that the party who on appeal complains of
> the error has contributed to it.

*Veith v. O'Brien*, 2007 S.D. 88, ¶ 27, 739 N.W.2d 15, 24 (quoting *Taylor Realty Co. v.

Haberling*, 365 N.W.2d 870, 873 (S.D. 1985), superseded on other grounds by rule as

stated in *Weber v. Rains*, 2019 S.D. 53, ¶ 33, 933 N.W.2d 471, 480).

[¶52.]        Here, Peneaux is complicit in his own dilemma.  During closing

argument, Peneaux's trial counsel asked the jury to find him guilty of Count 4 at

*three* separate points.[7]  Initially, defense counsel made this unmistakable concession to the jury:

> Count 4, did he annoy her?  I think he probably annoyed her when he sent the sexual messages.  The lewd or lascivious act.  All right, fine.  When Jay said these sexual comments, that probably annoyed Brittany.  *I would agree that it probably constitutes that crime there.*

(Emphasis added.)

[¶53.]    Peneaux's attorney then made a second acknowledgment of guilt by describing the threatening or harassing conduct charge as the "one I just talked about that Jay is likely guilty of."  And for the clincher, defense counsel directly asked the jury to find Peneaux guilty of Count 4 as part of an apparent strategy to avoid convictions on the felony charges he faced:

> Ladies and gentlemen, we are going to ask you to go through this.  We are going to ask you to vote not guilty on Count 1.  Not guilty on Count 2.  Not guilty on Count 3.  I would agree the sexual comment he sent her, fine.  *Guilty of Count 4.*  Not guilty of Count 5.  And not guilty of Count 6.

(Emphasis added.)[8]

[¶54.]    Under the circumstances, Peneaux should not be surprised that the jury found him guilty of Count 4.  Allowing review here would foster an incongruent rule under which a party can argue, with impunity, that a court or jury erroneously did exactly what the party wanted.

---

7.    Peneaux is represented by different counsel on appeal.

8.    This type of defense strategy has been discussed in the context of post-conviction litigation.  *See e.g.*, *Rocha v. Jones*, No. CIV.A. 99-CV-71714-D, 2001 WL 902628, at *4 (E.D. Mich. June 12, 2001) ("Trial counsel asserted that his planned trial strategy was to inform the jury that petitioner was guilty of the misdemeanor charges, but innocent of the felony charges.").

[¶55.]     In its *Flowers* decision, the Florida District Court of Appeal expressed the same view, capturing the essence of the defendant's argument and the application of the invited error doctrine in a crisp and clean opening paragraph:

> Beware what you ask for.  Here, defense counsel requested a jury instruction on a lesser included charge.  [The defendant] was then convicted on that lesser included charge, and [the defendant] now seeks to be released without the possibility of retrial because the lesser included charge his attorney requested was time-barred.  The invited error doctrine precludes such a "heads I win, tails you lose" game.

*Flowers*, 149 So. 3d at 1207.

[¶56.]     The Court's suggestion that the invited error doctrine should not apply here because trial defense counsel transposed the evidence relating to Counts 4 and 5 confuses two concepts—being correct and being purposeful.  *See People v. Perez-Rodriguez*, 2017 COA 77, ¶ 25, 411 P.3d 259, 266 (holding invited error need not be "competent or well planned" but "simply . . . deliberate rather than inadvertent"); *Flowers*, 149 So. 3d at 1208 (applying the invited error doctrine where defense counsel "should have known" that conviction of the lesser included offense was time-barred when counsel requested it).

[¶57.]     Right or wrong, the record indicates that defense counsel deliberately conceded guilt on Count 4, which was, of course, the only misdemeanor charge.  No one has claimed that this was coincidental or that Peneaux's trial defense counsel actually meant to admit guilt to Count 5, instead of Count 4.

[¶58.]     Under the circumstances, I would not consider Peneaux's deferred challenge to Count 4.